**Dolores WALCEK, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 94–315L.

United States Court of Federal Claims.

April 5, 2001.

Stanley J. Walcek, Bethany Beach, Delaware, attorney of record for plaintiffs.

Thomas L. Halkowski, Washington, D.C., Department of Justice, attorney of record for defendant. Barry Gale, U.S. Army Corps of Engineers, of counsel.

## OPINION

ALLEGRA, Judge.

This regulatory taking case is before the court following a trial held in Wilmington, Delaware and Bethany Beach, Delaware. Plaintiffs seek just compensation under the Fifth Amendment because the Army Corps of Engineers (the Corps) failed to grant a requested permit to allow for the full development of Federal wetlands on plaintiffs' property. Instead, the Corps issued a limited permit allowing only for a scaled down development, one which plaintiffs claim is not economically viable. Based on the evidence presented, and for the reasons set forth below, the court concludes that plaintiffs are not entitled to recover, as no taking of their property has occurred.

## I. FINDINGS OF FACTS

Plaintiffs own 14.5 acres of real property in Bethany Beach, Delaware (the Property). In 1971, shortly before the enactment of the Clean Water Act,[1] plaintiffs (and two other

---

1. The Clean Water Act was originally passed as the "Federal Water Pollution Control Act Amendments of 1972." 86 Stat. 817. In 1977, Con-

individuals no longer owners)[2] purchased the Property in two separate transactions for a total price of $117,731. As the accompanying map indicates, the four parcels that constitute the Property are approximately 1,500 feet deep and have approximately 570 feet frontage on Maryland Route 26, as well as over 400 feet on the Bethany Beach Loop Canal that runs parallel to Route 26. The alignment of the Property provides potential access to Central Boulevard, which, in turn, allows access to Bethany Beach without having to use the often-crowded Route 26. A topographic survey indicates that the elevation of the Property decreases significantly from the front of the Property (along Route 26) to the back of the Property (along the Bethany Loop Canal). The area nearest the highway is forested land dominated by red maples; as one moves farther away from the highway and steadily downward towards the Canal, the Property shifts from being populated by marsh elder and bushes, to a high salt marsh characterized by common reed (*e.g.*, phragmites), and, ultimately, to a salt marsh vegetated primarily by salt marsh cordgrass.

Of the 14.5 acres at issue, 13.2 acres are federally regulated wetlands under Section 404 of the Clean Water Act, 33 U.S.C.

gress formally approved the shortened title, "Clean Water Act." 91 Stat. 1567.

**2.** The parcels were purchased by a group of four partners; (i) Dolores and Stanley Walcek; (ii) Irving and Esther Fisher; (iii) Albert Walcek; and (iv) Robert and Regina Ammons. Each of the partners received a ¼ interest in the 14.5 acre parcel. In 1979, Dolores and Stanley Walcek obtained the ¼ interest in the Property previously held by the Fishers. Tax documentation indicates that interest was acquired for approximately $29,734 more than the original cost of the ¼ interest. Plaintiffs own the Property as tenants in common.

§ 1344, thereby requiring any filling of this property to be approved in a permit issued by the Corps. The 13.2 acres of wetlands includes tidal and non-tidal wetlands. Somewhere between 4.5 and 5.2 acres of the wetlands, lying on the portion of the Property closest to the Bethany Beach Loop Canal, are mapped as state wetlands by the State of Delaware (the State) and generally consist of tidal wetlands. Any filling of this property would require approval from the State under its Wetland Act, 7 De. C. §§ 6601, *et seq.*[3] Portions of the Property are interlaced with drainage ditches, called "mosquito ditches" in the local jargon, that were installed by the Corps in the latter part of the 1930s. These tidal ditches, as well as other low-lying portions of the tidal wetlands on the site, are below the mean high water mark, and as such, are subject to regulation under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

Mr. Stanley Walcek, owner and representative of the co-owners of the Property and a retired attorney, has been familiar with the Bethany Beach area since 1961, when he invested in property in the area. He and his family stayed in the area during summers and eventually moved there. In 1969, Mr. Walcek was approached by the prior owners of three of the four parcels at issue, regarding the potential sale of their property. Discussions with these owners and their sons eventually prompted the plaintiffs to purchase three of the four parcels in September of 1971, for a price of approximately $108,000. In October of 1971, Mr. Walcek was advised by a realtor that there was an adjoining parcel available for purchase. Within weeks, plaintiffs purchased this fourth parcel, which contains about 1.25 acres of uplands, for a price of approximately $8,000.[4]

Plaintiffs purchased the entire Property with the intent of developing it, with Mr. Walcek, who invested in twelve pieces of property between 1957 and 1976, being "the motivating force" in this regard. Mr. Walcek made all the decisions regarding the development of the Property, but consulted his partners about matters involving any significant outlays of money.[5] At trial, Mr. Walcek testified that the plaintiffs purchased the Property with the intent of supplementing their retirement incomes. The Property was zoned for residential purposes, with each house required to have at least 5,000 square feet, thereby permitting approximately eight houses per acre. Before purchasing the Property, neither Mr. Walcek nor any of the

3. The parties have stipulated that "there is no reasonable likelihood that such approval would be granted to allow residential development at the subject site."

4. Several witnesses testified regarding the regulatory climate at the time the plaintiffs acquired the Property. Edward Bonner, a senior biologist for the Corps in Philadelphia, Pennsylvania, noted that while the Corps jurisdiction under Section 404 of the Clean Water Act dated back only to 1972, its jurisdiction under Section 10 of the Rivers and Harbors Act dated back to 1899. Mr. Bonner indicated that in 1968, the Corps' focus under the Rivers and Harbors Act broadened from protecting the navigability of the nation's waterways to environmental protection. He testified that had the plaintiffs submitted a plan to develop the Property in 1971, the Corps would have considered the impact of the proposal on the wetlands under the Rivers and Harbors Act. Mr. Bonner's testimony was corroborated by Mr. Edward Merrick Launay, an expert in the application of federal, state and local regulations to the area of land planning, with a particular emphasis on environmental restrictions. Mr. Launay verified that the drainage ditches, as well as the entire frontage of the Property along the Bethany Canal and other portions of the salt marsh, were below the mean high water line and, as such, were subject to the Corps's jurisdiction under the Rivers and Harbors Act at the time plaintiffs acquired the Property.

5. Tax documentation provided by plaintiffs indicates that the total amount of money paid by the partners with respect to the Property between 1971 and 1996 was $291,969. This amount includes the original purchase price of $117,731, as well as maintenance expenses that were deducted on the partnership's income tax returns (the majority of which were incurred after 1984). That same documentation indicates that, on December 31, 1996, the partnership's tax basis in the Property, *i.e.*, the basis used to calculate the income or loss under the Internal Revenue Code, derived from the sale of the Property was $671,334; however, $501,633 of that figure derives not from any expenditures made by the partnership, but from an adjustment to the basis made under the Internal Revenue Code when one of the partner's died and passed his interest in the Property to his wife. Subtracting the $501,633 from the $671,334, yields an "economic" basis (*i.e.*, reflecting the true cost basis) in the Property of $169,701.

other plaintiffs conducted any systematic studies of the Property, regarding such things as soil type, underground springs or other circumstances that might impact on its suitability for development. Nor, prior to the purchase, did any of the plaintiffs contact any engineering or land-use consultants regarding the Property, or attempt to secure any information regarding any existing or impending federal restrictions on the development of the Property.

Almost from the outset, the plaintiffs were interested in having the Property zoned "commercial," in hopes that such a zoning change would cause the value of the Property to skyrocket. Toward that end, in 1974, plaintiffs submitted a concept plan to the Bethany Beach Town Zoning and Planning Commission (the Planning Commission) in an effort to have the front part of the Property, from Central Boulevard to Route 26, which encompasses about six or seven acres, zoned as commercial. This plan proposed that a canal be dredged from the Bethany Beach Loop Canal through the center of the Property, with mixed commercial and residential development on either side. In the face of public opposition, plaintiffs' abandoned this plan in the mid–1980s, withdrawing the rezoning application, based, in part, on their belief that it would most certainly be denied by the Planning Commission. Indeed, John Eckrich, the building inspector for the town of Bethany Beach, testified at trial that he knew of "no residential land [in Bethany Beach] that has been zoned commercially since the 70s." In approximately September of 1987, plaintiffs shifted gears and envisioned filling the entire property, to allow for a border-to-border 77–lot residential development.

Mr. Walcek testified that he first realized that the Property was subject to wetlands regulation in early March of 1984, when he and the other plaintiffs entered into a conditional contract to sell the land for $1 million to J. Kiernan and others. When Mr. Kiernan submitted the contract to plaintiffs, he proposed building on only a portion of the Property, excluding the state wetland areas. By its terms, this contract was "contingent upon [Mr. Kiernan] obtaining all necessary permits for the construction and sales [sic] of 60 or more townhouse units upon the subject property." [6] Following this event, later in 1984, Mr. Walcek requested that the Corps verify the exact contours of the state and federal wetlands on the Property. Still later that year, the Corps notified plaintiffs that the Property included 13.2 acres of federally regulated wetlands, approximately four to five acres of which were also state tidal wetlands. By the time they received this information, plaintiffs had released Kiernan from the contract, at his request.

Despite receiving notification from the Corps that 13.2 of the 14.5 acres of the Property constituted wetlands, plaintiffs, between 1984 and 1987, began filling and developing the Property without the required federal and state permits. According to Mr. Walcek, these efforts were designed to clear the Property, in hopes that it would dry out and no longer be considered wetlands. Toward this end, the Plaintiffs hired an individual to install a temporary road, to cut out the underbrush and to thin the trees on the wooded portion of the Property. At the same time, plaintiffs also sought to clean, maintain and gate the drainage ditches, in an effort to promote better drainage of the Property. Once becoming aware of these developments, the Corps, on May 27, 1986, issued a cease and desist order, requiring plaintiffs to discontinue filling and clearing activities on the Property, activities, the Corps asserted, violated the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* (1982). Under this order, plaintiffs were required to remove the unauthorized fill material from the Federal wetlands within 30 days. Ultimately, although not within the original time period specified, plaintiffs complied with the order.

On February 22, 1988, plaintiffs submitted to the Corps an application under section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1988), for authority to fill and develop the

6. In a letter dated May 23, 1984, the Corps informed Mr. Kiernan that based on a May 16, 1984, inspection of the site by a Corps representative, the Corps believed "that the proposed project property consists almost entirely of wetland habitat adjacent to Bethany Beach Canal." The letter further indicated that the Corps does not "condone a policy of filling wetlands."

land. Plaintiffs apparently filed this application before applying for a state permit because the state wetlands were encompassed within the federal wetlands. The Corps rejected the application as incomplete. Instead of providing the information that had been requested by the Corps, plaintiffs chose to pursue a declaratory judgment action—which ultimately was dismissed by the U.S. District Court for the District of Delaware. In 1992, plaintiffs requested that the Corps reactivate their application and then, on November 20, 1992, after their declaratory action had been dismissed, plaintiffs chose to submit an entirely new application for a 77–lot "border to border" development. On June 8, 1993, plaintiffs responded to questions raised by the Corps and supplemented their application to include more specifics regarding, *inter alia*, the proposed use of bulkheading, drainage ditches and fill material.

In order to develop the wetlands, plaintiffs also needed to acquire a Coastal Zone Management Consistency Certification and a Section 401 Water Quality Certification from the State of Delaware. On June 25, 1993, plaintiffs notified the Delaware Department of Natural Resources and Environmental Control (DNREC) that their development plans could not conform to the Delaware Coastal Zone Management Plan regulations regarding the destruction of wetlands.[7] On July 23, 1993, DNREC notified plaintiffs that their development project, as planned, was inconsistent with DNREC policies, and, therefore, it could not issue a Coastal Zone Management Consistency Certification. In the letter, the DNREC suggested that alternatives were available for development of the Property, including a "scaled down" development proposal that would fill less acreage and preserve the majority of the wetlands.[8]

On December 20, 1993, after receiving notice of DNREC's denial of the required consistency certificate, the Corps notified plaintiffs that because Delaware had determined that the project was inconsistent with the Delaware Coastal Zone Management Program, the Corps was denying, without prejudice, the plaintiffs' section 404 permit application pursuant to 33 C.F.R. §§ 320.4(j) and 325.2(b).[9] On January 6, 1994, the DNREC notified plaintiffs that their Section 401 Water Quality Certification application had been inactivated because of the Corps' denial of their federal application. On May 13, 1994, plaintiffs filed this lawsuit, alleging that defendant's December 20, 1993, denial of a section 404 permit constituted a taking of plaintiffs' property.

Subsequently, in August of 1995, in what he then described as "an addendum to the application," Mr. Walcek sent the Corps a plat showing four alternatives for use of the Property that did not involve a border-to-border development. On February 1, 1996, the Corps responded to these proposals indicating that it might approve an alternative that would utilize the upland portion of the Property and two segments of the wetlands

---

7. In a letter sent to the Corps that day, Mr. Walcek indicated that, based on his prior meetings with Corps representatives, "[y]ou have no suggestion as to any alternate uses the property may have for us, including taking into account mitigation."

8. Several witnesses testified that it was unlikely or even "highly unlikely" that the Town of Bethany Beach would approve the 77–lot plan, most likely requiring the proposal to be scaled back by deducting all, or at least a sizeable portion of, the federal and state wetlands. The record, in fact, includes indications that there was public opposition to the development based on concerns with the proposed eradication of wetlands and the possibility that the project would cause flooding elsewhere. Several other witnesses, including Charles C. Miller, a wetlands biologist retained by plaintiffs, testified that, at least after 1973, when the Delaware Wetlands Act was passed,

and certainly in 1996, it would have been unreasonable for a developer to expect to receive approval from the State of Delaware to develop the state tidal wetlands portion of the Property.

9. During the year in question, 33 C.F.R. § 320.4(j) provided, in pertinent part, that "where the required Federal, state and/or local authorization and/or certification has been denied for activities which also require a Department of the Army permit before final action has been taken on the Army permit application, the district engineer will, after considering the likelihood of subsequent approval of the other authorization and/or certification and the time and effort remaining to complete processing the Army permit application, either immediately deny the Army permit without prejudice or continue processing the application to a conclusion." 33 C.F.R. § 320.4(j) (1993).

adjacent to Route 26. This letter also noted the possibility that plaintiffs might enter an agreement to mitigate the loss of wetlands by creating or enhancing wetlands elsewhere.[10] On April 11, 1996, Mr. Walcek attended a meeting with state and federal officials, presenting an alternate plan for developing the Property that would have required the filling and disturbance of approximately 8 acres of federal wetlands. On April 15, 1996, plaintiffs submitted an "Alternatives Analysis of the Walcek Property Proposed Development Plans" to the Corps, which proposed a number of different options for developing the Property, including less-extensive developments than that proposed in the 1992 application.

In response, on July 3, 1996, the Corps sent plaintiffs a letter proposing three development proposals, indicating that these proposals were being made "[i]n an effort to provide you with more specific guidance concerning what would have a better chance of being permitted." The three proposals included a 28–lot single family subdivision plan, as well as alternate configurations allowing for a 26–lot subdivision and a 36–unit townhouse development. On August 7, 1996, Corps officials met with Mr. Walcek to discuss these proposals. On August 30 and September 26, 1996, the Corps informed plaintiffs that they must "demonstrate why the [three] proposals currently under consideration would not be practicable" before the Corps would consider alternative development proposals from plaintiffs. The Corps further stated that it would issue a decision shortly, after which plaintiffs would be responsible for applying for State Water Quality and Coastal Zone Consistency Certifications.

Plaintiffs responded in letters dated September 13 and October 19, 1996, asserting that the three alternative proposals were infeasible and unacceptable for various reasons (amplified at trial), among them: (i) plaintiffs were concerned the 28–lot plan would neither be approved by the Town of Bethany Beach nor the State of Delaware because it used wetlands; (ii) plaintiffs complained that the pads in the proposed development were smaller than allowed by zoning and smaller than pads on competing lots, which would make them difficult to sell profitably; (iii) plaintiffs were concerned whether the Town would permit a lot it owned adjacent to the Property to be used for access to Central Boulevard—access that was critical to the viability of the proposed development; (iv) plaintiffs complained that the proposals utilized only a small portion of the wetlands and would not result in an acceptable return on the partners' investment; and (v) the proposals utilized uplands property for which plaintiffs had not sought a permit.[11] Notwithstanding these concerns, on November 4, 1996, the Corps issued a permit authorizing a 28–lot residential development, consisting of two separate cul-de-sacs, one with direct access to Route 26 and the other with proposed access to Central Boulevard.[12] Under the permit, the Corps allowed for the filling of up to 2.2 acres of federally regulated wetlands on the Property, focusing that development on portions of the Property that contained what was viewed as less environmentally-significant flora (e.g., the phragmites). As a condition, however, the permit required the permittee to engage in mitigation by creating or restoring 4.4 acres of other wetlands.

In their complaint, plaintiffs sought compensation for both a permanent and temporary taking of the Property. They alleged

10. Mitigation of the destruction of wetlands by creation or enhancement of other wetland areas is typically required by the Corps, as a condition for the issuance of a Section 404 permit.

11. Various testimony at trial both supported and refuted these concerns. For example, Mr. Moynihan, plaintiffs' appraiser, testified that these concerns were bona fide and required him to discount the value of the 28–lot development. However, two other witnesses, Walton W. Sanderson, a housing developer in the Delaware–Maryland coastal area, and Edward Merrick

Launay, an expert on environmental restrictions, both testified that there was a reasonable likelihood that the 28–lot plan would be approved by the Town. Further, Mr. Eckrich, the Town's building inspector, not only indicated that the 28–lot plan would likely be approved, particularly because it minimized the environmental impact of the development, but also that the Town likely would also approve use of its property to connect the development to Central Avenue.

12. The expiration date of this permit was extended by the Corps in November of 1999.

that the Corps' 1993 decision denying, without prejudice, their permit request rendered the viable economic value of the Property useless and constituted a taking. In addition, they alleged that the delay between the cease and desist letter issued by the Corps in 1986 and the 1993 decision on the permit request amounted to a temporary taking of the Property.

On November 20, 1996, defendant filed a motion for summary judgment, arguing that, as a matter of law, neither a permanent nor a temporary taking had occurred. On December 4, 1997, plaintiffs filed a "Motion for Alternative Relief," which included a partial motion for summary judgment, arguing that genuine issues of fact existed in this case. Subsequently, this case was assigned to the undersigned judge. In an opinion dated August 11, 1999, this court held that, regarding plaintiffs' temporary taking claim, there were no genuine issues of material fact and that defendant was entitled to judgment as a matter of law. The court also held that the denial, in 1993, of plaintiffs' permit request did not effectuate a taking, as such denial was without prejudice.[13] Accordingly, the court believed that the focus of the case was on whether the 1996 permit effectuated a compensable taking. Regarding this claim, the court held that there were genuine issues of material fact concerning the value of the

property allegedly taken, the value of the property remaining and plaintiffs' reasonable investment-backed expectations, which issues precluded the granting of summary judgment for either party.

Based on this summary judgment order, trial in this case was limited to the issue of whether a regulatory taking took place when the Corps issued the limited 1996 permit, which did not allow plaintiffs to develop, as planned, the Property.[14] As described in greater detail below, resolution of that issue requires the court to consider three factors identified in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), focusing on: (i) the character of the government action; (ii) the extent to which the regulation interferes with reasonable investment backed expectations; and (iii) the economic impact of the regulation on plaintiffs' property. In an effort to address these factors, each side presented an appraisal report, as well as other reports and testimony by several experts. Laurence Moynihan and Joseph N. Melson, Jr, both real estate appraisers, were the primary expert witnesses for plaintiff and defendant, respectively. They each valued various development proposals, two of which are potentially relevant here—the 77–lot development

---

**13.** In its opinion, this court noted that the ripeness doctrine enunciated in cases such as *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), has been applied to federal takings claims. The court noted that in *Cristina Inv. Corp. v. United States*, 40 Fed.Cl. 571, 574, *appeal dismissed*, 155 F.3d 570 (Fed.Cir.1998), this court explained "[t]hat doctrine provides that a governmental denial will be considered final, and any federal takings claim arising from that denial will therefore accrue, if the property owner made a proper application which the government denied both on the merits and in such a manner as to reveal that reapplication for a modified plan would be futile." Applying this standard, the court concluded that while the Corps' 1993 decision denying plaintiffs' permit request "without prejudice" did not appear to be reviewable, the 1996 decision by the Corp to issue a limited permit clearly was a final reviewable determination, particularly as defendant's counsel had conceded that the 1996 permit was the broadest permit that the Corps is prepared to issue. *See also MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348, 106 S.Ct. 2561,

91 L.Ed.2d 285 (1986) (property owners submitted only one subdivision proposal rejected by a zoning body; as alternative uses of the site existed other than the one proposed, the takings claim was unripe because the zoning body had not yet rendered "a final and authoritative determination of the type and intensity of development legally permitted on the subject property"); *Howard W. Heck and Assocs. v. United States*, 134 F.3d 1468 (Fed.Cir.1998). *Cf. Cooley v. United States*, 46 Fed.Cl. 538 (2000) (holding permit denial a final decision where it would be futile for party to submit modified application for permit).

**14.** While plaintiffs never formally amended their complaint to raise this issue, it was tried by the implied consent of the parties and thus shall be treated, in all respects, as if it had been raised in the pleadings. *See* RCFC 15(b). Nonetheless, it should be noted that, notwithstanding this court's summary judgment ruling, plaintiffs continue to believe that the 1993 decision on their permit request constitutes a final decision reviewable by this court.

proposed by the plaintiffs and the 28–lot proposal authorized by the 1996 permit.

Mr. Moynihan prepared two appraisals of the 77–lot development. In the first of these, drafted in September of 1994, Mr. Moynihan evaluated the value of the proposed subdivision as of December 1993, using both the bulk sales and discounted cash flow methods. Under the bulk sales method, Mr. Moynihan relied on five comparable sales, adjusted them to take into account characteristic differences between the land sold and the Property, and derived a value of $2,310,000. Under the discounted cash flow method, Mr. Moynihan reviewed fifteen different sales and estimated a per lot value of $65,000 for the dry lots and $85,000 for the lots considered "wet," presumably those nearest the Bethany Loop Canal. Mr. Moynihan then estimated that the cost of developing the Property was approximately $700,000, or $9,000 per lot. In addition, Mr. Moynihan added a separate category for filling the land with 24,600 cubic yards of fill to bring the Property to a uniform elevation of 4 feet, adding a cost (at $5.00 per cubic yard) of $130,000 for site preparation. Based on a three-year sell out period, and applying additional deductions, inter alia, of 1.5 percent for transfer taxes, 7 percent for sales commissions and 18 percent for profit, Mr. Moynihan derived a series of cash flows to be generated by the Property, which he then discounted at a rate of 12 percent to arrive at the present value of the Property. This discounted cash flow analysis resulted in a figure of $2,342,000 for the "before" value of the Property. The appraisal indicated that the value of the Property with wetlands restrictions fully in effect, thereby allowing development only on the uplands portion of the Property, was $352,000.

Mr. Moynihan updated his earlier report in March of 2000, setting a new value for the Property as of November 4, 1996. In this later report, Mr. Moynihan used only the bulk sales method and evaluated the Property under two scenarios—a 77–lot development and a 116–unit townhouse development. In making these valuations, Mr. Moynihan used five bulk land sales comparisons to determine that each buildable townhouse unit on the Property would have a value of $22,700 and that each lot would have a value of $34,195. In making these assessments, Mr. Moynihan adjusted the figures relating to allegedly comparable sales in the area downward due to the comparatively worse size and topography of the lots on the Property. Relying on this approach, Mr. Moynihan's report concluded that the "before" value of the Property, without state or federal wetlands regulations in place, was $2,633,000.

The Government's expert, Joseph N. Melson, Jr. appraised the 77 lot development plan, as of November 4, 1996, at $1,065,000 using a bulk sales comparison approach, and at $950,000 using the discounted cash flow approach. His report differed from that of Moynihan in several major respects. First, in appraising the development, he first reduced the proposal from 77 to 71 lots, relying on the advice of Stephen Soule, a registered professional civil engineer who testified on behalf of defendant, that approximately six lots would be lost because of storm water management needs that had not been accounted for in the plans. Second, Mr. Melson believed the development costs for the 71–lot development under the discount cash flow method were closer to $1,500,000, $670,000 higher than the figure employed by Mr. Moynihan.[15] Mr. Melson deducted $1,500,000 in development costs from the sum of the "before" retail value of the Property of $4,640,000 (65 dry lots at a total of $4,190,000 and 6 waterfront lots at $450,000). He then further reduced the value of the property by 7 percent for sales commissions,

15. The development costs employed by Mr. Melson were based on opinions rendered by Messrs. Soule and Edward Launay, an environmental consultant retained by the Corps, that the fill needs for the Property were much greater than Mr. Moynihan had estimated. In making their calculation, Messrs. Soule and Launay relied on an updated topographic survey of the Property. Further, while Mr. Moynihan assumed that some of the soil present on the Property could be recycled as fill, thereby reducing the need for outside fill, Mr. Melson's appraisal report contends that the soil present on the Property is worthless as fill material due to its high root and salt content. Therefore, Mr. Melson concluded that there is a much larger need for fill to be shipped to the site, requiring 69,000 cubic yards of fill material being excavated and replaced.

20 percent for profit and 3 percent for taxes and administrative costs. This process yielded a total appraised value of a 71–lot development of $950,000.[16]

The two appraisers also assigned different values to the 28–lot development plan approved by the Corps. Plaintiffs' appraiser took his estimate of the value of the Property without restriction ($2,633,000) and then deducted the value of the uplands, to arrive at the value of the property subject to federal and state wetlands regulation. By dividing the remaining property by the number of remaining acres, Mr. Moynihan determined that the wetlands, if permitted, were worth $173,744 per acre. As the 28–lot permit was designed to allow plaintiff to fill 2.2 acres, this yielded a figure of $382,237. To this, Mr. Moynihan added the value of the uplands ($377,500) and the value of the remaining untouched wetlands at $1,125 per acre, and then subtracted $187,000 in mitigation costs (4 .4 acres at $42,500 per acre). Plaintiffs' appraiser thus concluded that, in 1996, the total value of the 28–lot development plan was $545,000.

By comparison, Mr. Melson valued the 28–lot development plan at $650,000. Applying a discounted cash flow model, Mr. Melson first used what he believed were comparable sales to arrive at a per lot average sale price of $64,650. Based on information received from Messrs. Launay and Soule, Melson estimated the development costs at $13,807 per lot, including the cost of wetlands mitigation elsewhere, and then deducted amounts for sales commissions, administrative expenses and profit over the two years he believed would be necessary to sell the developed lots. Relying on these assumptions and then employing a 12 percent present value factor, Mr. Melson determined that the 28–lot development was worth $630,000, plus the value of the wetlands as undeveloped of $17,500 (using comparables that yielded 10 acres at $1,750 per acre), producing a total value of approximately $650,000. Applying a bulk sales approach, Mr. Melson reviewed comparable sales, made adjustments to those figures (overall increasing their value) and concluded that the value of the Property was approximately $22,500 per lot, or $630,000. From this figure, Mr. Melson deducted $62,600 for mitigation-related costs (approximately $125,000 less than the figure employed by Mr. Moynihan),[17] leaving a value for the 28–lot development under this approach of $565,000. Comparing this value to that derived from the discounted cash flow method, Mr. Melson ultimately concluded that, as of November 4, 1996, the 28–lot development scenario should be $650,000. In making this determination, Mr. Melson assumed that "the necessary remaining permits are obtained for developing the parcel," and, unlike Mr. Moynihan did not discount his figure to take into account the possibility that such permits might not be received.

## II. DISCUSSION

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. As recently explained by the Supreme Court, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enterprises v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). Along these lines, Justice Holmes long ago opined that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). This oft-quoted language is the genesis of the so-called regulatory takings doctrine, first invoked to challenge mining and zoning laws, but here invoked in the context of the Federal program for the management and protection of wetlands. Plaintiffs allege that the permit issued by the Corps under

---

16. Using the bulk sales approach, Mr. Melson adjusted each of the comparables downward by $5,000 to correspond to the "considerable fill" required on the Property.

17. Mr. Melson arrived at this lower figure for mitigation based, in part, on the assumption that fill taken from the mitigation site could be used in the development of the Property.

that program, which allows only partial development of the Property, so diminished the value of their property as to effectuate a permanent taking.

 A property owner may show that the government has effectuated a "categorical taking" by demonstrating that a regulation has denied the property owner of "all economically beneficial or productive use of land." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Such is not the case here. Even if a property owner is unable to demonstrate such a categorical taking, he or she may be able to prove that the government affected a compensable "partial taking." *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1570 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). In such cases, the court must conduct a series of "ad hoc, factual inquiries" into the circumstances to determine whether there is a taking. *See Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). *See also Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (definition of a taking not controlled by "any set formula," but is dependent on "ad hoc, factual inquiries into the circumstances of each particular case"). In 1978, the Supreme Court, attempting to add a skeletal framework to this inquiry, identified three factors that are particularly significant in determining whether governmental action constitutes a taking: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[18] The court will review the application of these factors, and the evidence that relates to them, *seriatim.*

## A. Economic Impact

 The first criterion—the economic impact of the regulation—is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies Harbor,* 28 F.3d at 1176. *See also Pennsylvania Coal,* 260 U.S. at 413, 43 S.Ct. 158 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). The focus of this factor is on the change in the fair market value of the subject property caused by the regulatory imposition—in other words, the court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). *See also Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646; *Florida Rock,* 18 F.3d at 1567. As will be seen, this prong of the *Penn Central* inquiry actually involves several tiers of analysis.

### 1. The "Parcel as a Whole"

 The economic analysis under the first *Penn Central* factor is often expressed in the form of a fraction, the numerator of which is the value of the subject property encumbered by regulation and the denominator of which is the value of the same property not so encumbered. As a threshold matter, in order to derive this fraction, the court must first define the subject property to be valued, or, in the terms of the Supreme Court in *Penn Central,* ascertain the "parcel as a whole." "This issue is particularly important for wetland cases," one commentator has noted, "because permit denials or conditions are frequently directed only to the wetland portions of properties that invariably contain uplands." Mark A. Chertok, *Federal Regulation of Wetlands* (hereinafter "Chertok"), SE98 ALI–ABA 715, 779 (2000). Thus, to the extent the property captured in the denominator includes only wetlands, the

---

**18.** *See also Good v. United States,* 189 F.3d 1355, 1360 (Fed.Cir.1999), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1554, 146 L.Ed.2d 459 (2000); *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed.Cir.1994); *Florida Rock Indus., Inc.,* 18 F.3d at 1567; *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir.1994).

impact of the regulation in diminishing the value of the corresponding numerator is predictably more pronounced, and thus more indicative of a taking, than would be the case if the same denominator were to include not only the wetlands, but also the uplands and other property unrestricted by the regulation. Given this, it should come as little surprise that defendant argues that the Property, in its entirety, constitutes this "parcel as a whole," while plaintiffs assert that only the wetlands portion of the Property, for which the permit application was actually submitted, should be considered.

The Supreme Court has provided guidance on how to identify the requisite "parcel as a whole," sometimes referring to this as the "denominator issue." [19] In *Penn Central,* where it held that air rights over Grand Central station could not be considered separately from other contiguous property in analyzing whether a landmark law effected a taking, the Court opined that takings law "does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Penn Central,* 438 U.S. at 130, 98 S.Ct. 2646. The Court doubly stressed this principle in its post-*Lucas* decision in *Concrete Pipe & Products, Inc. of California v. Construction Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), first stating that "[t]o the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question." 508 U.S. at 644, 113 S.Ct. 2264. In the same opinion, the Court went on to recollect that, in its earlier decision in *Penn Central,* it had concluded that "a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable." *Id.* *See also Dolan v.*

*City of Tigard,* 512 U.S. 374, 400–01, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (summarizing cases); *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) ("[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety."). Various decisions of this court, the Federal Circuit and the Court of Claims affirm the application of these principles in wetlands taking cases. *See Tabb Lakes, Ltd. v. United States,* 10 F.3d 796 (Fed.Cir.1993); *Jentgen v. United States,* 228 Ct.Cl. 527, 657 F.2d 1210, 1212–13 (1981); *Ciampitti v. United States,* 22 Cl.Ct. 310, 318–19 (1991).

While the "nonsegmentation" principle established in these decisions is seemingly straight-forward, the Supreme Court has cautioned that applying it often presents difficult line-drawing problems. *See Lucas,* 505 U.S. at 1016–17 n. 7, 112 S.Ct. 2886. Heeding this warning and employing a somewhat holistic standard, this court has observed that "[t]he effort should be to identify the parcel as realistically and fairly as possible, given the entire factual and regulatory environment." *Ciampitti,* 22 Cl.Ct. at 319. *See also Keystone,* 480 U.S. at 499, 107 S.Ct. 1232 (property "is viewed in the context of any reasonable unit of petitioners' coal mining operations and financial-backed expectations ..."); *Loveladies Harbor,* 28 F.3d at 1181 ("Our precedent displays a flexible approach, designed to account for factual nuances."). Seeking to give effect to their view of the facts, plaintiffs rely on the recently-decided *Palm Beach Isles Assocs. v. United States,* 208 F.3d 1374 (Fed.Cir.2000), *on reh'g, supplemented, reaff'd,* 231 F.3d 1354 (Fed.Cir. 2000), as evidence that, in some circumstances, the *Penn Central* economic analysis focuses only on the portion of property for which a permit is being sought, *i.e.,* the wetlands.

---

**19.** In *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), the Supreme Court phrased this problem in the following terms:

> Because our test for regulatory takings requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical

questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'

*Id.* at 497, 107 S.Ct. 1232 (quoting Frank Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv. L.Rev. 1165, 1192 (1967)).

260

In *Palm Beach*, the plaintiff purchased a 311.7 acre parcel in Florida in 1956. In 1968, it sold most of this land, but retained ownership of a 50.7 acre tract, consisting of 49.3 acres of lake bottom and 1.4 acres of adjacent shoreline. The Corps denied the plaintiff's application for a permit to dredge and fill this property, and plaintiff filed suit in this court, claiming the denial constituted a regulatory taking. This court concluded that for purposes of conducting the economic analysis, the relevant parcel was the entire 311.7 acres, and found, on that basis, that there was no regulatory taking. On appeal, the Federal Circuit rejected this court's denominator analysis and held that the relevant parcel was not the entire acreage originally purchased by the plaintiff, *i.e.*, the 311.7 acres, but rather only the 50.7 acres that plaintiff retained and was seeking to develop. 208 F.3d at 1380. In reaching this conclusion, the Federal Circuit focused on the fact that the two parcels—the 50.7 acres and the remainder—were separated by a road, never part of a common development scheme and were different types of property, subject to different zoning. It also heavily relied on the fact that all but 50.7 acres had been sold by the plaintiff in 1968, long before the development in question was proposed. *Id.* at 1380–81.

Defendant strenuously asserts that *Palm Beach* was wrongly decided and is inconsistent with prior Supreme Court and Federal Circuit precedent.[20] Whether this criticism is warranted or whether that decision instead represents a novel extension of takings jurisprudence, it remains that *Palm Beach* is clearly distinguishable on its facts. Unlike *Palm Beach*, the case *sub judice* is neither one in which a portion of the property was sold prior to the time a permit was sought, nor one in which uplands and the wetlands

were zoned differently or intended to be developed separately. Rather, here, the Property is contiguous and unsubdivided; was purchased over a matter of a month or two, with uniform ownership; has been maintained for many years as a single parcel; has the same zoning status; and, in all the plans the partners advanced, has always been intended to be developed as a whole. Accordingly, the facts in this case stand in sharp contrast to those in *Palm Beach* and lead this court to conclude that, consistent with the economic realities in this case, it may not segment into smaller parcels, property that plaintiffs continuously have viewed and treated as inextricably linked since it was first acquired in 1971.

Indeed, in its critical features, this case factually resembles *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 657 F.2d 1184 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). In that case, the plaintiff purchased a 10,000 acre parcel, including wetlands, with the intention of developing a residential community. While Deltona's master plan envisioned building the development in five stages, it assumed that the "community would be a thoroughly integrated, unified whole." 657 F.2d at 1188. Although Deltona was granted permits to dredge several portions of this property, following the passage of the Clean Water Act, it was denied permits to perform the same task on other portions of its property, leading it to file suit, alleging a taking, in the Court of Claims. Finding that the passage of the Clean Water Act frustrated Deltona's reasonable investment-backed expectations, the court, nonetheless, concluded that there was no taking because Deltona had derived other economic benefits from its property. Indicating that it was "important to bear in mind

20. For authority supporting defendant's view, *see Palm Beach Isles Associates, Inc. v. United States*, 231 F.3d 1365, 1366 (Fed.Cir.2000) (Gajarsa, J., dissenting from denial of petition for rehearing en banc). *See also* Note, *Federal Circuit's Holding Introduces Subjective Factors into Takings Clause 'Denominator' Analysis*, 114 Harv. L.Rev. 926, 930 (2001) (criticizing *Palm Beach* as allowing property owners to recast virtually any regulatory taking case into categorical taking by parsing their property into discrete units). *See generally*, John E. Fee, *Unearthing the Denomina-*

*tor in Regulatory Taking Claims*, 61 U. Chi. L.Rev. 1535, 1557 (1994) (indicating that "[t]hrough reliance on the subjective criteria of ownership and actual or intended use, courts have gone astray"). *Palm Beach, supra*, however, appears consistent with *Loveladies Harbor*, 28 F.3d at 1181, in which the Federal Circuit suggested that land "developed or sold before the regulatory environment existed" should not be included in the denominator. *See also* Chertok, *supra* at 781–83 (discussing these and other cases).

the Supreme Court's admonition" in *Penn Central, supra,* that " '[t]aking jurisprudence does not divide a single parcel into discrete segments,' " 657 F.2d at 1192 (quoting *Penn Central, supra*), the Court of Claims refused to focus solely on the parcels for which Deltona had previously been denied a permit, and instead considered the value of contiguous uplands, as well as other portions of the property on which permits had been granted. 657 F.2d at 1192–93. Applying this definition of "the parcel as whole," the Court found that Deltona could develop 111 acres of uplands without a permit, realizing therefrom a significant profit over what it originally paid for the entire parcel. Based on this finding, the court concluded that the permit denials did not result in a taking, but rather "some diminution in value," as the regulations did "not deprive Deltona of the economically viable use of its land" because "Deltona's remaining land uses are plentiful and its residual economic position very great." *Id.* at 1192–93.

The Federal Circuit has followed *Deltona* on several occasions, most appositely, for our present purposes, in *Tabb Lakes, Ltd., supra.* In *Tabb Lakes, supra,* the court also rejected a contention that wetlands should be segregated from uplands in assessing the impact of a regulation on a contiguous property, stating:

While in some cases it may be difficult to determine whether all economic viable use of the "property" has been destroyed, that is not a serious problem here. Clearly, the quantum of land to be considered is not each *individual* lot containing wetlands or even the combined area of wetlands. If that were true, the Corps' protection of wetlands via a permit system would, *ipso facto,* constitute a taking in every case where it exercises its statutory authority. *Penn Central* . . . negates that view.

10 F.3d at 802 (emphasis in original). Similarly in *Jentgen,* 657 F.2d at 1213, the Federal Circuit held that the "parcel as a whole" constituted not only 80 acres of wetlands, but 20 acres of contiguous uplands, emphasizing, in so concluding, that "it is important to bear in mind the Supreme Court's admonition [in *Penn Central*]." This court, in turn, has recurringly applied these principles, with similar results, in various cases factually indistinguishable from the instant case.[21] Based upon these authorities and, in particular, their application to the facts of this case, this court thus finds that the denominator of the economic value fraction must be the value of the entire Property, unencumbered by wetlands regulations. Under this scenario, the court further finds that this denominator essentially corresponds to the value of the 77–lot border-to-border development plaintiffs have proposed.[22]

---

21. *See Forest Props. v. United States,* 39 Fed.Cl. 56, 73 (1997), *aff'd,* 177 F.3d 1360 (Fed.Cir. 1999) (lake bottom/upland treated as single parcel where treated as single income-producing unit for purposes of financing, planning and development); *Broadwater Farms Joint Venture v. United States,* 35 Fed.Cl. 232 (1996), *vacated on other grounds,* 121 F.3d 727 (Fed.Cir.1997) (table) (12 lots on property treated as single parcel where intended to be developed as a whole); *Formanek v. United States,* 26 Cl.Ct. 332, 339 (1992) (12 acres of uplands included in a 112–acre tract); *Ciampitti,* 22 Cl.Ct. at 318–19 ("[i]n the case of a landowner who owns both wetlands and adjacent uplands, it would clearly be unrealistic to focus exclusively on the wetlands, and ignore whatever rights might remain in the uplands" where two properties, though not contiguous, were "inextricably linked in terms of purchasing and financing"). *Cf. Bowles v. United States,* 31 Fed.Cl. 37, 41 n. 4 (1994). Summarizing these cases, one commentator has observed that "the courts have assessed the degree of contiguity, dates of acquisition, the extent to which the parcel has been treated as a single unit

(by both the owner and government), and the extent to which the undeveloped or protected lands enhance the value of the remaining lands." Chertok at 783.

22. In a report prepared in September of 1994, plaintiffs' expert, Mr. Moynihan, opined that the highest and best use of the property was a 77–lot subdivision. At trial, Mr. Moynihan submitted an updated report on the Property in which he contended that the best use would be a clustered townhouse development of 116 units. He opined that such a configuration would require less fill than a 77–lot housing development because the townhouses could be built on wood piling foundations. However, his updated report placed the same value of the Property—$2,633,000—on both the 116–town house and 77–separate lot scenarios. Moreover, in neither this updated written report nor his testimony at trial did Mr. Moynihan provide any detail regarding how he derived his estimate of the development costs for the townhouse development or how those estimates differed from that for the 77–lot

But before assigning a value to this denominator, the court must yet resolve questions regarding the proper numerator to be used in the economic value fraction, that is, the value of the Property subject to wetlands regulations. Defendant argues that the 28–lot proposal offered by the Corps, in granting the permit in question, is viable and represents the best use of the property consistent with the wetland regulations. Plaintiffs, for their part, contend that this proposal is not economically viable and that the numerator of the fraction should essentially be the value of the uplands, augmented slightly by the value of the contiguous undeveloped wetlands. Plaintiffs note correctly that where the government offers to allow the partial development of property and seeks to establish a value for that development, it must show a "reasonable probability that the land is both physically adaptable for such use and that there is a demand for such use in the reasonably near future." *Loveladies Harbor,* 21 Cl.Ct. 153, 158 (1990) (quoting *United States v. 341.45 Acres of Land,* 633 F.2d 108, 111 (8th Cir.1980)), *aff'd,* 28 F.3d 1171 (Fed. Cir.1994). *See also Olson v. United States,* 292 U.S. 246, 255–56, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); *Formanek v. United States,* 26 Cl.Ct. 332, 339 (1992).

In the instant case, the court finds that the 28–lot proposal is viable. Contrary to plaintiffs' claims, the evidence presented at trial, particularly the testimony of John Eckrich, Bethany Beach's building inspector, indicated that the 28–lot proposal would be consistent with the town's zoning requirements [23] and likely would be approved by the town's planning commission. Various witnesses, includ-

ing Mr. Eckrich and Mr. Launay, also testified that it was likely that the town would approve connecting the development to Central Avenue, allowing a road to be built over an unoccupied piece of land owned by the town.[24] These and other witnesses essentially indicated that they believed that the town would welcome a development that would minimize the impact on the wetlands contained on the Property. Other concerns raised by plaintiffs—for example, that the lots in such a development might be smaller than those in competing developments—go not to the viability of the project, but to the value thereof, and, to the extent relevant, are discussed below.

## 2. Assigning values to the numerator and denominator

Having defined the subject property whose value, in two variations, is to be captured in the economic analysis fraction, the court must next place values on the numerator and denominator of the fraction, relying, for that purpose, on the extensive expert testimony and reports introduced at trial. The following chart summarizes the initial values that each of the parties' appraisers ascribed to the relevant parcels in 1996, the year the limited permit was issued by the Corps:

| | 77 lot development | 28 lot development |
| ----------------- | ------------------ | ------------------ |
| Mr. Moynihan (P) | $2,633,000 | $545,000 |
| Mr. Melson (D) | $ 950,000 | $650,000 |

While the court believes that the expert testimony offered by the defendant's expert tends more accurately to reflect the true values of the 77-lot and 28–lot development, the court declines, for the reasons described below, to

development. Indeed, his updated report did not include even a basic plan for the 116–unit development, showing, for example, how and where the units would be arrayed. Because, as discussed in detail below, the court rejects, as erroneous and incredible, Mr. Moynihan's testimony regarding the development costs for the 77–lot development, and because, unlike the 77–lot development, there is no factual basis for recalculating the development costs for the townhouse development, the court rejects, as untenable and unsupported, plaintiffs' attempt to treat the 116–unit development as reflecting the highest and best use of the property.

23. In some instances, plaintiffs have misapprehended town zoning rules. For example, while

plaintiffs assert that the wetlands used in the proposal would have to be deducted from density calculations, apparently causing the lots to be too small, these requirements apply only to Planned Residential Developments (PRD), such as townhouse developments, and are inapplicable to the free-standing houses that would be built under the 28–lot development.

24. These witnesses indicated, *inter alia,* that likelihood of the town's approval was enhanced by the fact that the proposed development would cause Central Avenue to dead-end in a cul-de-sac, preventing it from becoming a heavily-trafficked thoroughfare.

adopt outright either parties' valuations. The court will review the estimates for each of the two developments in turn.

### i. The denominator—the value of the 77–lot development

In evaluating the 77–lot development, both plaintiffs' expert witness, Mr. Moynihan, and defendant's expert, Mr. Melson, relied, to varying extent, on two methods of appraisal: (i) the bulk sales method, under which the value of the Property is derived solely by comparison to other sales; and (ii) the discounted cash flow method, in which comparable sales are used to establish gross revenue for the project, from which costs of development are then deducted, resulting in a stream of revenue that is then present valued using a discount factor to derive a value for the property. Since both of these methods begin with comparable sales, it is critical that the court finds that the comparables used by Mr. Melson more accurately reflect the value of the parcel in question than those employed by Mr. Moynihan. Indeed, virtually every comparable sale offered by Mr. Moynihan in his first report was challenged and refuted, convincingly, not only by the defendant's witnesses, but, in some cases, by Mr. Moynihan's own admissions on cross-examination.[25] Nor is Mr. Moynihan's amended report any better as it appears that most of the comparison sales employed there involved properties with six or fewer units on an acre or less of property—sales that other witnesses persuasively testified were not comparable to the Property because of their relatively small size.[26] By comparison, the comparables employed by Mr. Melson went virtually unchallenged by plaintiffs and appear to represent properties much more similar to the Property.

The quality of their respective comparables aside, the gap between the experts' estimates of the 77–lot development may be traced primarily to two factors: First, Mr. Melson adjusted the number of lots in the proposal downward from 77 to 71, based on plaintiffs' failure to account adequately in their plans for, storm water management facilities. When asked about this point at trial, Mr. Moynihan did not contest this adjustment and the court, therefore, finds Mr. Melson's testimony on this point convincing. Second, the experts greatly disagreed regarding the cost of fill and other developments (e.g., curbs, sewers, roads) needed to effectuate the 77–lot plan, with Mr. Moynihan estimating those costs at $830,000 and Mr. Melson setting the same figure at $1,468,800. On this latter count, the court finds Mr. Melson's testimony and report more credible for the reasons that follow.

In estimating the fill cost at $130,000, Mr. Moynihan relied on three major assumptions—first, that the fill quantity could be reduced by recycling soil excavated from other parts of the Property; second, that elevation figures he had been given regarding the topography of the Property were accurate; and third, that the Property needed to be filled only to a uniform level of 4.0 feet. Each of these assumptions, however, proved erroneous. Defendant's experts, Mr. Soule and Mr. Launay, convincingly demonstrated, both in their reports and their testimony, that: (i) the soil excavated on the Property could not be recycled because it would be full of organic material and sodium and thus particularly unfit for a housing development; (ii) Mr. Moynihan greatly underestimated the Property's fill needs because he relied on erroneous figures that were revealed, through a careful topography survey of the

---

**25.** Thus, for example, Mr. Moynihan admitted that he had erred in describing one comparable as not having many houses bordering water, when, in fact, 100 of the 103 units at that location were on the water. With respect to another comparable, Mr. Moynihan described the number of units at a location as 27, when the site actually had 62 units. And in the case of another alleged comparable, Mr. Moynihan relied on the $1.2 million listing price, despite readily available information indicating that the property had sold for $500,000 prior to the date of his apprais-

al, and for $550,000 after the target date of the appraisal.

**26.** For example, Mr. Warrington, an expert on real estate sales and development in the Bethany Beach area, testified that these smaller projects would not benefit from economies of scale that would bring down the costs associated with lots on larger parcels. For example, he indicated that large parcels of land are generally purchased for a lower price per acre, which is then translated into a lower cost per lot.

Property, to place the elevation of the Property more than a foot higher than it actually is; and (iii) the Property needed to be filled to a level of at least 4.5 feet, and, in some places, 5 feet, in order to avoid flooding the Property on a daily basis. Relying on the topographic survey of the Property referred to above, these witnesses calculated that the true fill needs were at least three times the estimate used by Mr. Moynihan (69,000 cubic yards versus 24,600 cubic yards). Based on the foregoing evidence, the court believes that these higher figures represent the better estimate of the true fill needs associated with the 71–lot development.

Further, in estimating development costs at $700,000, Mr. Moynihan did not follow industry standards and consult with an engineer, but instead allegedly utilized figures supplied in a guide published by the Marshall and Swift Valuation Service (the M & S guide).[27] When pressed, however, Mr. Moynihan was unable to explain, in even the most rudimentary of details, how he used the guide to make these calculations, leading the court to conclude that his testimony on this point was wholly incredible. At all events, Mr. Soule, a civil engineer, testified that the figures provided by the M & S guide do not provide an adequate basis for evaluating the true costs of developing property in the Bethany Beach area. This point is borne out by the guide itself, which cautions that "[c]osts for residential street improvements vary greatly due to local code requirements for different materials, street types and layouts, and utilities. The following costs are averages including ordinary charges for engineering, plans and inspection."[28] Taking into account the unusually low elevation of

the Bethany Beach area, Mr. Soule submitted an expert report that estimated that the true development costs, including fill costs, were on the order of $20,687 per lot, for a total of $1,468,800. And his testimony was corroborated by Mr. Melson and by a further study provided by Mr. Launay. As such, the court concludes that the true development costs for the 77–lot development are represented by Mr. Melson's figure of $1,468,800, approximately $639,000 more than the figure Mr. Moynihan employed.

Based on the foregoing, the court concludes that plaintiffs have not shown that the Property, unrestricted by wetland regulations, is worth anywhere near the $2.6 million figure plaintiffs claim. At a bare minimum, the value plaintiffs ascribed to the 77–lot plan must be adjusted downward to account for: (i) the poor quality of the "comparables" employed by Mr. Moynihan; (ii) a reduction in the number of saleable lots from 77 to 71 to account for storm water management structures; and (iii) an increase in fill and development costs from $830,000 to $1,468,800. Because the court believes that the comparables employed by Mr. Melson better reflect the value of the Property, those figures should be used as the starting point for the value calculation, yielding an average cost per lot of $65,000.[29] At the same point, the court has no reason, based upon the record, to question the other basic assumptions employed by Mr. Moynihan in his discounted cash flow method (*e.g.*, a three year sale period with two principal phases of development, 2 percent for administration/management, 18 percent for profit, 7 percent for sales expenses, 1.5 percent for transfer taxes and 12 percent discount rate). Giving effect

---

27. In his original appraisal, Mr. Moynihan indicated that he had estimated the costs of development by consulting an engineer who was the manager of a construction company. At trial, however, Mr. Moynihan could not identify this individual. During cross-examination, excerpts from his prior deposition were introduced in which he admitted that his figures were based upon calculations he made using the figures in the M & S guide, suggesting that, at best, his conversations with the engineer were cursory. The court thus does not find credible Mr. Moynihan's claim that his numbers were based upon any meaningful consultations with a qualified engineer.

28. Along these lines, Mr. Soule testified that the figures in the M & S guide were essentially useless in the Bethany Beach area, due to the low elevation of the city. For example, due to the high water table in that area, sewer lines could not be installed in the typical fashion.

29. As an average, this figure factors in the higher value of those lots that would be nearer to the Bethany Beach Canal, as well as the relatively lower value of those lots not on or near the water.

to these various findings and using a discounted cash flow method otherwise similar to the approach employed by Mr. Moynihan, the resulting value of the Property under the 71 lot scenario would be approximately $1,485,000 (*see* Appendix A, *infra*). The court believes that this figure represents an accurate estimate of the value of the denominator in the economic analysis fraction.[30]

### ii. The numerator—the value of the 28–lot development

Both appraisers also ascribed values to the proposed 28–lot development—Mr. Melson set the value at $650,000, while Mr. Moynihan estimated it at $545,000. While the approaches employed by the appraisers differed dramatically,[31] the different values they derived were driven by the differences in their respective estimates of the cost of providing the 4.4 acres of wetlands mitigation required by the Corps permit. In this regard, Mr. Melson's appraisal, which relied on a figure supplied by Mr. Launay, set the mitigation costs at $62,600 ($45,800 for the mitigation work and $16,800 for acquiring the land), or approximately $14,227 per acre. By comparison, Mr. Moynihan, assertedly relying on information provided by Mr. Charles Miller, a wetlands biologist who had supervised other mitigation efforts, estimated the cost of mitigation to be approximately $187,000, or approximately $42,500 per acre.

Based on the evidence presented, the court believes that the true cost of mitigation lies somewhere between the parties' estimates. The basis for Mr. Launay's estimate, upon which Mr. Melson relied, was not fully explained either in testimony or in defendant's expert reports. And based upon testimony provided by several witnesses, Mr. Launay's costs for acquiring the land that would be converted into wetlands appear to be unreasonably low. At the same time, it is notable that the mitigation figure employed by Mr. Moynihan exceeds the range established by Mr. Miller, who admitted, under cross examination, that he had previously determined that a reasonable range for mitigation expenses, including the cost of acquiring the land, was between $22,000 and $40,000 per acre. Moreover, at a later point in his redirect testimony, Mr. Miller candidly testified that a figure of $30,000 per acre would be a "reasonable" estimate of mitigation costs.[32] That lower figure is also supported by a stipulation filed by the parties indicating that the cost of mitigation here would be reduced, *inter alia*, by using the fill excavated from a mitigation site (where wetlands are being created) and placing it on the Property where fill is required for development. Accordingly, in the court's view, the evidence supports a finding that a reasonable cost of mitigation here would be $30,000 per acre, or $12,500 per acre less than the figure Mr. Moynihan employed in estimating the value of the 28–lot development.

Projecting a savings of $12,500 per acre, and relying on the other assumptions in Mr.

---

**30.** Defendant argues that the denominator should be reduced further—and significantly—to reflect the fact that, even without the Federal wetlands regulations, plaintiffs would be prohibited, under Delaware law, from developing the approximately 5 acres of the Property that are state wetlands. In *Ciampetti v. United States*, 18 Cl.Ct. 548, 555–56 (1989), this court rejected a similar argument, finding that the interrelationship between Federal and State wetlands laws precluded the Federal government from essentially asserting the existence of the State wetlands regime as a per se defense to a Federal taking. In so concluding, this court reasoned that "[a]ssuming that no economically viable use remains for the property, the Constitution could not countenance a circumstance in which there was no fifth amendment remedy merely because two government entities acting jointly or severally caused a taking." *Id.* at 556. Although unnecessary to the decision reached below, this

court believes that a similar rationale warrants rejection of defendant's argument in the instant case.

**31.** Mr. Moynihan essentially backed the value of the 28–lot development out of his value for the 77–lot development by determining an average value for each acre of developed wetlands and combining that figure with his estimate of the value of the Property's uplands. As such, his calculation for the 28–lot development suffers all the same errors he committed in appraising the larger parcel.

**32.** This lower estimate is also supported by an estimate prepared by Mr. Miller in February of 2000, in which he indicated that mitigation for 5 acres would cost $116,350 or $23,270 per acre. This figure included a cost of $45,000 (or $9,000 per acre) for acquiring the raw land.

Moynihan's report, the court concludes that his estimate for the 28–lot development should be increased by $52,800 (4.4 acres times a $12,500), yielding a final value for the 28–lot development of $597,000.

### iii. Profit

■ The comparative value of the Property before and after the regulatory imposition is not the sole indicia of the economic impact of the regulation. Rather, the Federal Circuit has indicated that, in assessing the severity of the economic impact of the regulations, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored," thereby requiring the court to compare "the relationship of the owner's basis or investment" in the property before the alleged taking to the fair market value of the property after the alleged taking. *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

■ While the case law thus makes clear that profit or return of investment is a factor to be considered in assessing economic impact, there is considerably less direction on how to perform this analysis. Indeed, although both sides agree that such a calculation must be undertaken, *how* such an analysis should be done is in dispute. Several observations, however, seem appropriate. Certainly, in determining an owner's basis or investment in property, it appears reasonable and logical to include not only the initial purchase price, but also other capital expenditures that the owners may have incurred with respect to their property. At the same time, it would seem inappropriate to include in the basis or investment expenses that were deducted as current (and, therefore, non-capital) expenses on the owners' income tax returns. At the very least, in calculating the owners' investment in the property, such expenses should be discounted by the value of the tax savings they have already produced. Nor, in determining the plaintiffs' basis or investment in the Property, does it seem appropriate to adjust the plaintiffs' historical costs for inflation by using the Con-

sumer Product Index (CPI). At least three reasons warrant this conclusion and require a few words of elaboration.

To begin with, an adjustment for inflation is not ordinarily included in calculating an individual's "investment" in property, nor most certainly is it reflected in the "basis" employed by a taxpayer in calculating gain for income tax purposes. *See* 26 U.S.C. §§ 1001(a), 1011, 1016(a)(1) (basis equals cost adjusted by capital expenditures). There is not the slightest indication in the original *Florida Rock* opinion, *supra*, that the court intended to deviate from these common and traditional formulations of the concepts of "investment" or "basis." *See also Deltona*, 657 F.2d at 1192 (making this profit calculation without adjusting for inflation); *Ciampitti v. United States*, 22 Cl.Ct. at 320 (same). Second, factoring inflation into this economic analysis would only serve to obscure what should be its main focus: whether the application of the regulation, standing alone, prevents a reasonable return on a prior investment. Indexation necessarily blurs this distinction as it would incorporate into the calculation a measure of whether the profit realized on the hypothetical sale of the property exceeded a baseline expectation (*i.e.*, a return in excess of inflation) unrelated to the regulation. There is no assurance that any investment, let alone an investment in property, will increase in value in lock-step with inflation and, indeed, a host of reasons, wholly unrelated to regulation, why the value of a particular parcel might be less than the cash invested therein adjusted by inflation, among them the possibility that the amount initially invested in the property exceeded its true value (*i.e.*, the owner overpaid) and that capital expenditures made with respect to the property did not contribute value thereto on a dollar-for-dollar basis. Finally, as the prior discussion illustrates, indexing a property owner's investment or basis also would introduce a plethora of uncertainties and complexities into the calculation—which index, if any, of the CPI should be employed? Should the index employed include the relatively volatile food, medical and energy components?

What of regional variations in inflation?[33] For these and other reasons, the court concludes that plaintiffs' use of inflation adjustments in their computations suffer from what Justice Holmes, in another context, called "[t]he dangers of a delusive exactness." *Truax v. Corrigan*, 257 U.S. 312, 342, 42 S.Ct. 124, 66 L.Ed. 254 (1921) (dissenting opinion). *Cf. Florida Rock Indus., Inc. v. United States*, 45 Fed.Cl. 21, 38 (1999) (including an adjustment for CPI without explanation), *judgment entered*, 2000 WL 331830 (Fed.Cl. Mar. 28, 2000).

In the instant case, the parties have stipulated that, in addition to the $117,731 paid to purchase the Property, the partners, between 1971 and 1996, paid an additional $174,238 with respect to the Property, with $144,504 of that amount expended to cover maintenance of the property. Accordingly, plaintiffs' total cash outlay with respect to the property is $291,969. Because portions of these expenditures were currently deducted on the partners' income tax returns, the parties have stipulated that, for purposes·of assessing profitability and return of investment, the appropriate tax basis in the Property is $169,701.[34] Based on these figures, it appears that if the plaintiffs constructed the 28–lot proposal under the permit received from the Corps, they would realize $305,031 over their total cash outlays and $427,299 over their appropriate tax basis.[35]

#### iv. Redux

Based on the foregoing, the court finds that the values of the 77–lot and 28–lot developments are $1,485,000 and $597,000, respectively. Consequently, the court finds that the imposition of the wetlands regulations on the Property, thereby preventing its full use, resulted in a dimunition in value of approximately 59.8 percent. In addition, under this first prong of the *Penn Central* test, the court finds that plaintiffs would derive an economic profit of at least $305,000, or approximately twice their investment, were they to proceed with the proposed 28–lot development.

### B. The Extent to Which the Regulation has Interfered with Distinct Investment–Backed Expectations

■ The second factor of the *Penn Central*—the interference with distinct investment-backed expectations—is a "way of limiting takings recoveries to owners who [can] demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor*, 28 F.3d at 1177. *See also Creppel*, 41 F.3d at 632 (the require-

---

**33.** Many of these same concerns have arisen in public policy debates over whether capital gains should be indexed by adjusting a taxpayer's basis by some measure of inflation. *See* Note, Shimon B. Edelstein, *Indexing Capital Gains for Inflation: The Impacts of Recent Inflation Trends, Mutual Fund Financial Intermediation, and Information Technology*, 65 Brook. L.Rev. 783, 808–09 (1999); Reed Shuldiner, *Indexing the Tax Code*, 48 Tax L.Rev. 537 (1993).

**34.** In labeling this figure as plaintiffs' tax basis, the parties recognize that it does not include a step up in basis triggered, under the income and estate tax codes, when one of the partners died. *See* 26 U.S.C. § 1014. The parties agree that, while technically part of the adjusted basis of the Property for federal income tax purposes, this adjustment is not appropriately considered in determining the return on plaintiffs' investment in the Property.

**35.** The court notes, but does not factor into its analysis, that some of the expenditures incurred by the plaintiffs were for clearing underbrush and trees on the Property—activities that oc-

curred after they became aware that portions of the Property were wetlands. These activities were conducted without a permit and led the Corps to issue a cease and desist notice. Arguably, such expenditures ought not be included in the basis or investment figure used for calculating profit, not only because they were incurred after plaintiffs knew that any future investments would have to factor in the wetlands regulations, but also to discourage individuals from undertaking unlawful activities on wetlands. *See Good v. United States*, 39 Fed.Cl. 81, 112 (1997) (refusing to include in the plaintiff's reasonable investment-backed expectations amounts expended after the regulated nature of the property was known), *aff'd*, 189 F.3d 1355 (Fed.Cir.1999), *cert. denied*, 529 U.S. 1053, 120 S.Ct. 1554, 146 L.Ed.2d 459 (2000). However, neither party has raised this issue nor provided the court with any information upon which to make such an adjustment. Any such adjustment would necessarily reduce plaintiffs' basis or investment in the Property, thereby increasing further the amount of profit likely to be made on the 28–lot development, for purposes of the economic analysis conducted here.

ment of investment-backed expectations "limits recovery to owners who can demonstrate that they bought their property in reliance on the nonexistence of the challenged regulation.") This factor encompasses two related elements: first, the extent of the plaintiffs' investment in reliance on the regulatory scheme in place at the time of the purchase; and second, the extent to which the regulation of their property was foreseeable. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1006, 1013, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). These expectations must be reasonable—"[a] 'reasonable investment backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus,* 467 U.S. at 1005–06, 104 S.Ct. 2862 (quoting *Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). *See also Good,* 189 F.3d at 1360; *Ciampitti,* 22 Cl.Ct. at 320–22.

Individuals purchasing property who reasonably should have been aware of the existence or impending existence of a regulatory regime negatively impacting the value of the property are deemed to have assumed the economic risk associated with that regime. As noted by the Federal Circuit:

> In legal terms, the owner who bought with knowledge of the restraint could be said to have no reliance interest, or to have assumed the risk of any economic loss. In economic terms, it could be said that the market had already discounted for the restraint, so that a purchaser could not show a loss in his investment attributable to it.

*Loveladies Harbor,* 28 F.3d at 1177. In such a case, "the owner presumably paid a discounted price for the property," and "[c]ompensating him for a 'taking' would confer a windfall." *Creppel,* 41 F.3d at 632. Because the market can anticipate regulatory developments, it follows that reasonable expectations may extend beyond legal restrictions already in place and encompass the foreseeable creation of a new regulatory program or the expansion of an existing program. *See Good,* 189 F.3d at 1361 (focusing on the "regulatory climate" that existed at the time of the purchase). Regarding the expansion of preexisting regulatory regimes, the Su-

preme Court has noted that " '[t]hose who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.' " *Concrete Pipe & Prods., Inc.,* 508 U.S. at 645, 113 S.Ct. 2264 (quoting *Federal Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958)). *See also Branch v. United States,* 69 F.3d 1571, 1579 (Fed.Cir.1995), *cert. denied,* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996); *American Cont'l Corp. v. United States,* 22 Cl.Ct. 692, 697 (1991).

Here, plaintiffs argue that they invested in the Property with the expectation that they would be permitted to develop it fully. The court does not doubt this was plaintiffs' subjective intent—but to what extent was that intent reasonable under the circumstances? In this regard, it is significant that plaintiffs purchased the Property in 1971, before the passage not only of the state regulatory scheme in 1973, but also the Clean Water Act in 1972. *See* Federal Water Pollution Control Act, Pub.L. No. 92–500, 86 Stat. 816 (1972); Delaware Wetlands Act, Del.Code Ann. Tit. 7, §§ 6601, *et seq.* (1973). Moreover, even after the passage of the Clean Water Act, the Corps, at first, adopted a narrow definition of the "navigable waters" subject to the Act, essentially defining them as coextensive with the "navigable waters" subject to regulation under Section 10 of the Rivers and Harbors Act. *See* 39 Fed.Reg. 12,115, 12,119 (April 3, 1974). It was not until 1975, following a district court decision invalidating the earlier regulation and ordering the issuance of broader regulations,[36] that the Corps finally issued an interim final regulation redefining "the waters of the United States" to include all freshwater wetlands that were located near navigable waters. *See* 40 Fed.Reg. 31,324 (July 25, 1975); 33 C.F.R. § 209.120(d)(2)(h) (1976). And it was not until almost ten years later, in 1985, that the Supreme Court finally resolved that these more expansive regulations represented a valid and reasonable construction of the statute. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 130–39, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). *See also*

---

**36.** *See Natural Res. Def. Council, Inc. v. Calla-* *way,* 392 F.Supp. 685, 686 (D.D.C.1975).

*Brace v. United States,* 48 Fed.Cl. 272, 277–78 (2000) (describing these events and subsequent regulatory developments in greater detail); Flint B. Ogle, *The Ongoing Struggle Between Private Property Rights and Wetlands Regulation: Recent Developments and Proposed Solutions,* 64 U. Colo. L.Rev. 573, 575–76 (1993).

One of the issues at trial was the extent to which these developments were foreseeable. Several witnesses testified that they were and that had plaintiffs, in 1971, consulted with an engineer or land use consultant they would have been apprised that their development plans for the Property would likely run into significant environmental and ecological hurdles. However, the court discounts this testimony to the extent that it assumes that plaintiffs should have foreseen not only the passage of the Clean Water Act itself, but also the regulatory developments that occurred from 1972 through 1977. Prior to 1975, the Corps employed a definition of wetlands that would not have covered all the portions of the Property that were eventually found to be wetlands under the regulations issued in 1975, as amended in 1977. It does not seem reasonable to impute to plaintiffs, at the time they purchased the Property in 1971, an interpretation of the Clean Water Act that the Corps itself initially eschewed and did not adopt until at least 1975 (and arguably 1977). While the *Penn Central* analysis anticipates reasonably foreseeable developments, it does not require a property owner to be clairvoyant. Indeed, in *Deltona, supra,* the Court of Claims found that the regulatory developments described above had upset the plaintiff's reasonable investment-backed expectations, noting that the regulatory regime had been "radically transformed" and had worked "an unforeseen change in the law." 657 F.2d at 1191.

This is not to say, however, that plaintiffs' reasonable investment-backed expectations extend to all the wetlands in question. In particular, the evidence shows that plaintiffs should have known, in 1971, that the portions of the Property interlaced with the drainage ditches and otherwise below the mean high water mark were subject to the regulatory requirements imposed under the Rivers and Harbors Act of 1899. While prior to 1968, the Rivers and Harbors Act was administered solely to protect navigability, in 1968, its regulatory criteria and coverage were expanded to consider the public interest, including pollution and ecology concerns. *See* 33 Fed.Reg. 18,670 (Dec. 18, 1968) (codified at 33 C.F.R. § 209). By 1970, this regulatory expansion had survived judicial challenge and the Corps' authority to limit dredging and filling based solely on ecological concerns had become accepted. *See, e.g., Zabel v. Tabb,* 430 F.2d 199 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Several cases have noted these events in concluding that reasonable investors in the late 1960s had to factor in the potential impact of these regulations on their investment. *See Good,* 189 F.3d at 1362; *Deltona Corp.,* 657 F.2d at 1187 ("[O]n December 18, 1968, in response to a growing national concern for environmental values and related federal legislation, the Corps [announced that it] would consider the following additional factors in reviewing permit applications: fish and wildlife, conservation, pollution, aesthetics, ecology, and the general public interest."). *See also Marks v. United States,* 34 Fed.Cl. 387 (1995), *aff'd without op.,* 116 F.3d 1496 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998) (taking rejected where land subject to navigational servitude).

Approaching thus the second prong of the *Penn Central* analysis, the court finds that, in 1971, when the Property was acquired, plaintiffs had a reasonable investment-backed expectation to develop some of the wetlands unhindered by wetlands regulations, but did not have such a reasonable expectation as to the lower-lying portions of the Property subject to the Rivers and Harbors Act. *See Dodd v. Hood River County,* 136 F.3d 1219, 1230 (9th Cir.1998), *cert. denied, mot. granted,* 525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 229 (1998) (holding that plaintiffs' investment-backed expectations to build their home in a Forest Use Zone were unreasonable since the regulations were in effect when plaintiff's purchased the property). As will be discussed in greater detail below, this finding is significant, for while the permit issued by the Corps in 1996 does not

allow for the development of these lower-lying portions of the Property, *i.e.*, the land that was and is subject to the Rivers and Harbors Act, it does permit development of the other wetlands on the Property, *i.e.*, the wetlands that eventually became subject to the Clean Water Act.

## C. The Character of the Governmental Action.

 The last criterion—the character of the government action—requires the court to consider the purpose and importance of the public interest underlying the regulatory imposition, focusing, in particular, on whether the challenged restraint would constitute a nuisance under state law. In analyzing this criteria, "courts must inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *Creppel*, 41 F.3d at 631. *See also Forest Props., Inc.*, 177 F.3d at 1366; *Loveladies Harbor*, 28 F.3d at 1179. "[W]hile most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of the advantage of living and doing business in a civilized community," the Supreme Court has stated, "some are so substantial and unforeseeable, and can so easily be identified and redistributed, that justice and fairness require that they be borne by the public as a whole." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 14, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Burnishing this concept, the Supreme Court, in *Eastern Enterprises*, suggested that in considering whether, under this factor, a regulation "implicates [the] fundamental principles of fairness underlying the Takings Clause," two other indicia are relevant: (i) the extent to which the action is retroactive; and (ii) whether the action targets a particular individual. *Eastern Enterprises*, 524 U.S. at 537, 118 S.Ct. 2131.

There is no significant evidence in this case that the plaintiffs' proposed use of the Property would formally constitute a nuisance under Delaware state law, so that the application of the Federal wetland regulations could be viewed as enforcing a limitation already inherent in the Property. *See Creppel*, 41 F.3d at 631. *See also M & J Coal Co. v. United States*, 47 F.3d 1148, 1153 (Fed.Cir. 1995), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995). At the same time, the existence of the wetland regulations in question, as well as their application to the Property, indisputably serve an important public purpose—one which benefits plaintiffs as members of the public at large. *See, e.g., United States v. Riverside Bayview Homes, Inc.*, 474 U.S. at 131–35, 106 S.Ct. 455; *Brace*, 48 Fed.Cl. at 278–79. And, it is equally true here as it was in an earlier Federal Circuit case that "[t]he importance of preserving the environment, the authority of state and federal governments to protect and preserve ecologically significant areas ... through appropriate regulatory mechanisms is not here being questioned." *Loveladies Harbor*, 28 F.3d at 1175. Yet, it is also beyond peradventure that plaintiffs here are disproportionately burdened by those policies—a fact evident to anyone who observes that the Property is surrounded on all four sides by extensive developments that apparently were approved under prior regulatory regimes.

Considering the factors more recently identified in *Eastern Enterprises, supra*, the degree of retroactivity here is not extraordinary—even assuming arguendo that plaintiffs could not have reasonably anticipated the passage of the Clean Water Act (or the promulgation of the regulations thereunder) when they purchased the Property, it remains that portions of the Property were already subject to regulation under the Rivers and Harbors Act and that the Clean Water Act passed approximately a year after the parcels were acquired. Further, the Clean Water Act and the wetlands regulations issued thereunder are generally applicable to all similarly situated property owners and can in no way be viewed as being directed at plaintiffs. Accordingly, while the absence of a nuisance certainly cuts in favor of a finding of a taking, other circumstances in this case ameliorate somewhat the impact of the third *Penn Central* factor in this regard.

## D. Weighing the Three Factors

Summarizing the results of its analysis, the court concludes as follows:

■ **Economic Impact.** First, under the economic analysis prong, the court finds that the imposition of the wetlands regulations here diminished the value of plaintiffs' property by approximately 59.7 percent. Such a diminishment certainly does not constitute a categorical taking under *Lucas, supra,* where the Supreme Court held that a dimunition of 93.7 percent did not constitute such a taking. While the Court in *Lucas* suggested that such a dimunition might also not be indicative of a regulatory taking under the economic analysis factor under *Penn Central,* it refrained from drawing a bright line. Indeed, while courts have often struggled with the dichotomy between compensable "partial takings" and noncompensable "mere dimunitions," searching for a bright line beyond which dimunition would be indicative of a taking, several Supreme Court decisions suggest that dimunitions in value approaching 85 to 90 percent do not necessarily dictate the existence of a taking. *See Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking despite 75 percent dimunition); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (no taking despite 87.5 percent dimunition). With one possible exception, this court has likewise relied on dimunitions well in excess of 85 percent before finding a regulatory taking. *See Loveladies Harbor,* 21 Cl.Ct. 153, 160 (1990) (taking—99 percent), *aff'd,* 28 F.3d 1171 (Fed.Cir.1994); *Bowles,* 31 Fed.Cl. at 48–49 (taking—92–100 percent); *Formanek,* 26 Cl.Ct. 332, 340 (1992) (taking—88 percent). *See also 1902 Atl. Ltd. v. United States,* 26 Cl.Ct. 575, 579 (1992) (88 percent loss satisfies "economic impact" factor, although no taking found).[37] Conversely, both the Supreme Court and the Federal Circuit have held that a percentage of value loss comparable to that found here is not indicative of a taking. *See Concrete Pipe,* 508 U.S. at 645, 113 S.Ct. 2264 (no taking—46 percent dimunition); *Jentgen,* 657 F.2d at 1213 (no taking—50 percent dimunition). *See also Ciampitti,* 22 Cl.Ct. at 320 (no taking—25 percent dimunition). *See generally* David F. Coursen, *The Takings Jurisprudence of the Court of Federal Claims and the Federal Circuit,* 29 Envtl. L. 821, 848–51 (1999) (discussing these and other cases).

While this court is no better postured than others to set a bright line dividing compensable from noncompensable exercises of government regulatory power, in the court's view, it stretches the concept of partial taking too far to say that a dimunition on the order of 60 percent or less has the effect of a taking.[38] As was recognized by the Supreme

---

**37.** In his most recent opinion in *Florida Rock,* former Chief Judge Smith found that a 73.1 percent dimunition in the value of the subject property was indicative of a partial taking. *Florida Rock Industries, Inc. v. United States,* 45 Fed.Cl. at 40–41. The opinion, however, noted that this level of dimunition is "not dispositive of the issue," *id.* at 41, and, in concluding that a taking had occurred, relied on two other findings: (i) that, subject to the regulation, plaintiff could recoup only half of its "inflation adjusted investment;" and (ii) that the banning of plaintiff's mining activity destroyed plaintiff's reasonable investment backed expectations. In this court's view, the first of these findings, to the extent it relies on an investment figure adjusted for inflation, is legally erroneous and irrelevant, *see* discussion *infra* at 267, while the second finding upon which this opinion proceeded—that the mining companies investment-backed expectations were totally frustrated—has no factual corollary in the instant case. *Id.* at 33. In other regards, this most recent *Florida Rock* opinion seems, with all due respect, disharmonious with Supreme Court precedent, for example, in suggesting that "[t]he notion that the government can take two thirds of your property and not compensate you but must compensate you if it takes 100% has a ring of irrationality, if not unfairness, about it." 45 Fed.Cl. at 23. By comparison, in *Lucas,* Justice Scalia, writing for the majority and responding to a similar point, stated:

> It is true that in at least some cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. But that occasional result is no more strange than the gross disparity between the landowner whose premises are taken for a highway (who recovers in full) and the landowner whose property is reduced to 5% of its former value by the highway (who recovers nothing). Takings law is full of these "all-or-nothing" situations.

505 U.S. at 1019 n.8, 112 S.Ct. 2886.

**38.** As Edmund Burke once said, "[t]hough no man can draw a stroke between the confines of night and day, still light and darkness are on the whole tolerably distinguishable."

Court in another case involving a wetland permit, "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. at 127, 106 S.Ct. 455. Such is not the case here, particularly as plaintiffs stand to realize a significant profit if they develop the Property consistent with the permit they have received from the Corps. The fact that this profit is less than what plaintiffs would have realized in an entirely unregulated universe is not determinative, as the Supreme Court has also made amply clear that frustration of the most profitable or highest and best use of property by the government is not necessarily indicative of a taking. *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646. *See also Andrus,* 444 U.S. at 66, 100 S.Ct. 318; *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); *Florida Rock Industries,* 791 F.2d at 902.

**Reasonable Investment–Backed Expectations.** Second, the court finds that while plaintiffs had a reasonable investment-backed expectation that they could develop the portion of the Property that became Federal wetlands under the regulations promulgated under the Clean Water Act, no such expectation existed as to the lower-lying portions of the Property which, at the time of their purchase by plaintiffs, were already subject to regulation under the 1899 Rivers and Harbors Act. Moreover, because the permit granted by the Corps allows for development of 2.2 acres of the wetlands that became subject to regulation under the Clean Water Act, the court finds that plaintiffs' reasonable investment-backed expectations as to that portion of the Property have been accommodated to a not insignificant degree.

**Character of the Government Action.** Third, and finally, although there is a bit of evidence to the contrary, the court finds that development of the Property would not constitute a nuisance under state law, tending to support the conclusion that a taking occurred here. The impact of this factor, however, is ameliorated by the fact that the imposition of the wetlands regulations here was not entirely retroactive or, in the case of the Clean Water Act, at least not severely retroactive, and was not targeted on the plaintiffs.

## III. CONCLUSION

On this record, the court concludes that the application of the wetlands regulations has not effected a taking of plaintiffs' property. Rather, guided by the three-tiered *Penn Central* analysis, the court finds that the limitations associated with the permit granted by the Corps result only in a noncompensable dimunition in the value of plaintiffs' property and allow plaintiffs to realize to a not insignificant degree their true reasonable investment-backed expectations.[39] As such, the Clerk is directed to enter judgment dismissing the complaint. No costs.

**IT IS SO ORDERED.**

39. In denying the government's petition for rehearing in *Palm Beach,* the Federal Circuit suggested that the trial court, in analyzing whether a taking had occurred, might draw a distinction between the 49.3 acres of submerged land involved in that case and the 1.4 acres of other wetlands on the grounds that the submerged land was more likely to be subject to a navigational servitude defense under the Rivers and Harbors Act. 231 F.3d at 1364. The court remanded this matter to the trial court to determine, ultimately, whether there was a taking of the 1.4 acres. *Id.* In the instant case, dividing the Property into two parcels—that is, those wetlands subject to the Rivers and Harbors Act and those not—clearly would result in a ruling that neither portion was taken. Thus, if this court were to focus first on the portion of the Property subject to the Rivers and Harbors Act, it would conclude that there was no taking based upon plaintiffs' lack of reasonable investment-backed expectations. If the court then were to focus on the portion of the Property not subject to the Rivers and Harbors Act, it would conclude that, because the Corps' permit allows for partial development of that property, the dimunition in the value of that parcel, occasioned by the imposition of the wetlands regulations, would be significantly less than the 59.7 percent dimunition occasioned by the imposition of such regulations on the entire Property. As such, the court would conclude that this second parcel was also not taken by the imposition of the wetlands regulations.

## APPENDIX A

| | 3 months | 6 months | 9 months | 12 months | 15 months | 18 months | 21 months | 24 months | 27 months | 30 months | 33 months | 36 months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # of Lots | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 5 |
| Price per lot | $ 65,000.00 | $ 65,650.00 | $ 66,306.50 | $ 66,969.57 | $ 67,639.26 | $ 68,315.65 | $ 68,998.81 | $ 69,688.80 | $ 70,385.69 | $ 71,089.54 | $ 71,800.44 | $ 72,518.44 |
| Income from Sales | $ 390,000.00 | $ 393,900.00 | $ 397,839.00 | $ 401,817.39 | $ 405,835.56 | $ 409,893.92 | $ 413,992.86 | $ 418,132.79 | $ 422,314.12 | $ 426,537.26 | $ 430,802.63 | $ 362,592.21 |
| Profit 18% | $ 70,200.00 | $ 70,902.00 | $ 71,611.02 | $ 72,327.13 | $ 73,050.40 | $ 73,780.91 | $ 74,518.71 | $ 75,263.90 | $ 76,016.54 | $ 76,776.71 | $ 77,544.47 | $ 65,266.60 |
| Sale Commission 7% | $ 27,300.00 | $ 27,573.00 | $ 27,848.73 | $ 28,127.22 | $ 28,408.49 | $ 28,692.57 | $ 28,979.50 | $ 29,269.30 | $ 29,561.99 | $ 29,857.61 | $ 30,156.18 | $ 25,381.45 |
| Administration 2% | $ 7,800.00 | $ 7,878.00 | $ 7,956.78 | $ 8,036.35 | $ 8,116.71 | $ 8,197.88 | $ 8,279.86 | $ 8,362.66 | $ 8,446.28 | $ 8,530.75 | $ 8,616.05 | $ 7,251.84 |
| Transfer Taxes 1.5% | $ 5,850.00 | $ 5,908.50 | $ 5,967.59 | $ 6,027.26 | $ 6,087.53 | $ 6,148.41 | $ 6,209.89 | $ 6,271.99 | $ 6,334.71 | $ 6,398.06 | $ 6,462.04 | $ 5,438.88 |
| Property Taxes | $ 16,289.00 | | | | $ 11,658.00 | | | | $ 6,625.00 | $ | | |
| Legal | $ 46,840.00 | | | | | | | | | | | |
| Fill & Site Prep. | $ 836,760.00 | | | | | | $ 631,240.00 | | | | | |
| Total Deduction | $ 1,011,039.00 | $ 112,261.50 | $ 113,384.12 | $ 114,517.96 | $ 127,321.14 | $ 116,819.77 | $ 749,227.96 | $ 119,167.84 | $ 126,984.52 | $ 121,563.12 | $ 122,778.75 | $ 103,338.78 |
| Total w/deductions | $ (621,039.00) | $ 281,638.50 | $ 284,454.89 | $ 287,299.43 | $ 278,514.43 | $ 293,074.15 | $ (335,235.11) | $ 298,964.94 | $ 295,329.59 | $ 304,974.14 | $ 308,023.88 | $ 259,253.43 |
| Discount Factor | 0.97087 | 0.94260 | 0.91514 | 0.88849 | 0.86261 | 0.83748 | 0.81309 | 0.78941 | 0.76642 | 0.74409 | 0.72242 | 0.70138 |
| Discount Amount | $ (602,948.13) | $ 265,472.45 | $ 260,316.04 | $ 255,262.67 | $ 240,249.33 | $ 245,443.74 | $ (272,576.31) | $ 236,005.92 | $ 226,346.51 | $ 226,928.21 | $ 222,522.61 | $ 181,835.17 |

$ 1,484,858.21