Filed 6/9/22 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| 640 TENTH, LP, et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>GAVIN NEWSOM, as Governor, etc., et al.,<br><br>    Defendants and Respondents. | D079339<br>(Super. Ct. No. 37-2020-00041316-CU-MC-CTL)<br><br>ORDER GRANTING APPLICATION TO FILE LETTER OF NEW AUTHORITY, MODIFYING OPINION, AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that Appellant's unopposed application to file letter of new authorities be granted.

It is further ordered that the opinion filed on May 13, 2022 be modified as follows:

1.     On page 3, the second paragraph and first sentence of footnote 4, beginning "Owners' unopposed supplemental request for judicial notice" is deleted and the following sentences are inserted in its place:

> Owners' unopposed supplemental request for judicial notice filed on November 17, 2021 is granted in part and denied in part.  The court takes judicial notice of Exhibit QQ (Stats. 2021, ch. 487, § 1 (Sen. Bill No. 336)).  (Evid. Code, §§ 451,

subd. (a) & 459, subd. (a).) The remainder of the request is denied.

2. In the second paragraph of footnote 4 on page 3, the second sentence that begins "As they concede," delete the word "they" and replace it with "Owners" so that the sentence reads as follows:

> As Owners concede, with the exception of exhibit II, none of the documents were provided to the trial court, and Owners fail to demonstrate good cause to consider them for the first time on appeal.

3. The first full sentence at the top of page 13 that begins with "Obviously, it would be impossible" is deleted and replaced with:

> Obviously, it would be impossible for Health Department directives authorized by the Governor's orders under section 8567, subdivision (a) to "take effect immediately" (*id.,* subd. (b)), *and* at the same time be subject to a 45-day waiting period.

4. On page 13, last sentence of the top paragraph, beginning "If the orders take effect immediately," the words "orders" is changed to "directives" so that the sentence reads:

> If the directives take effect immediately, then the APA cannot apply.

The petition for rehearing is denied.

There is no change in judgment.

McCONNELL, P. J.

Copies to: All parties

2

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| 640 TENTH, LP, et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> GAVIN NEWSOM, as Governor, etc., et al., <br><br>     Defendants and Respondents. | D079339 <br><br><br> (Super. Ct. No. 37-2020-00041316-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Affirmed. Requests for judicial notice granted in part and denied in part.

Prometheus Civic Law, Matthew Sean Harrison; Wilson Elser Moskowitz Edelman & Dicker and Bruno Katz for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Mark R. Beckington, Jeffrey T. Fisher and Alan D. Romero, Deputy Attorneys General, for Defendants and Respondents Gavin Newsom, Rob Bonta and Tomas J. Aragon.

Lonnie J. Eldridge, County Counsel, Joshua M. Heinlein, Deputy County Counsel; Paul, Plevin, Sullivan & Connaughton and Jeffrey P.

---

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts C through F of the Discussion.

Michalowski for Defendants and Respondents County of San Diego and Wilma J. Wooten.

This putative class action against California (state) and San Diego County (county) officials challenges Governor Gavin Newsom's emergency orders and related public health directives restricting business operations during the COVID-19 pandemic. The plaintiffs, owners of affected restaurants and gyms (Owners), primarily contend the orders are procedurally invalid because they were adopted without complying with the Administrative Procedure Act (APA) (Gov. Code,[1] § 11340 et seq.). Owners further maintain that the business restrictions are substantively invalid because they effected a taking without compensation, violating the Fifth Amendment to the United States Constitution. Rejecting these claims, the superior court sustained demurrers to the third amended complaint (Complaint) without leave to amend and dismissed the action.

We fully appreciate that the adverse effects of the present pandemic have not fallen equally on all segments of society, and that some small business owners are among those who have borne an especially heavy burden. As we recently noted, "Businesses have closed or drastically curtailed their operations. Employees have lost their jobs and their livelihoods." (*Midway Venture LLC v. County of San Diego* (2021) 60 Cal.App.5th 58, 66.) Still, Owners' procedural attack on the emergency orders fails because, for several reasons, the APA does not apply to the public health orders at issue here. And Owners' substantive challenge to the orders as an uncompensated "taking" under the Fifth Amendment suffers a similar fate. A mandated-but-*temporary* business closure to deal with a public health

---

[1]     Undesignated statutory references are to the Government Code.

emergency is not sufficiently akin to a governmental appropriation of private property for a public use so as to require compensation.

In short, while we sympathize with the position some Owners find themselves in and the significant financial losses they allege, the unambiguous terms of the Emergency Services Act (Emergency Act) (§ 8550 et seq.) and controlling United States Supreme Court regulatory takings caselaw require that the judgment be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *The Governor's Emergency Orders*

In response to the COVID-19 pandemic, Governor Newsom declared a state of emergency in California on March 4, 2020.[3] About two weeks later he issued Executive Order N-33-20, colloquially referred to as the "stay-at-home order." Among other restrictions, it prohibited restaurants from providing both indoor and outdoor dining.[4]

---

[2] The facts are taken from the allegations of the Complaint, its exhibits, and documents subject to judicial notice. (See *3250 Wilshire Boulevard Bldg. v. Employers Ins. Of Wausau* (1995) 39 Cal.App.4th1277, 1279.)

[3] Dates are in 2020 unless otherwise specified.

[4] Owners' unopposed request for judicial notice filed on October 19, 2021, which contains the Governor's executive orders cited in this opinion, is granted with the exception of exhibit GG, a published court of appeal opinion for which judicial notice is unnecessary. (*Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 817.) The "Request for Findings" embedded within this request for judicial notice is procedurally improper and in any event is also denied on the merits. (Cal. Rules of Court, rule 8.54; see *Diaz v. Professional Community Management, Inc.* (2017) 16 Cal.App.5th 1190, 1213 [power to make findings on appeal is discretionary and should be invoked sparingly, and only to affirm].)
Owners' unopposed supplemental request for judicial notice filed on November 17, 2021 is denied. As they concede, with the exception of exhibit II, none of the documents were provided to the trial court , and Owners fail to

Restaurants, gyms, and other businesses deemed nonessential remained closed until May 4, when the Governor issued Executive Order N-60-20. It allowed reopening in phases as determined by the Department of Public Health (Health Department). Restaurants and gyms in San Diego County were allowed to reopen in May and June respectively.

After a July surge of infections, the Health Department issued the "Guidance on Closure of Sectors in Response to COVID-19" (Guidance). It prohibited indoor dining in 29 counties, including San Diego.

The Blueprint for a Safer Economy (Blueprint) followed in late August. Replacing the previous staged reopening plan, it created a color-coded tiered system, updated weekly, that assigned each county a color (purple, red, orange, or yellow) based on its assessed risk level for COVID-19 transmission and imposed corresponding restrictions for different business sectors. For restaurants, indoor dining in "purple" counties was prohibited. Those in "red" counties were limited to operating at 25 percent capacity and prohibited from seating more than 100 people. Restaurants in "orange" counties were prohibited from operating at more than 50 percent capacity and could not

_____

demonstrate good cause to consider them for the first time on appeal. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) Exhibit II is not subject to judicial notice. It is a Los Angeles Superior Court order in a different case and therefore has no precedential effect on appeal. It also does not involve or discuss the Governor's powers under the Emergency Act, so it is simply not relevant. (See *Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 463, fn. 4 [denying request for judicial notice of court proceeding in another case as being irrelevant].)

Respondents' unopposed request for judicial notice filed January 19, 2022 is granted with respect to exhibits 5 and 6 (legislative history) and exhibit 7 (Executive Order N-60-20). In all other respects it is denied because the Internet statistical documents are not properly subject to judicial notice. (See *Conlan v. Shewry* (2005) 131 Cal.App.4th 1354, 1364, fn. 5 ["Beyond the mere fact that the report exists, the availability of the report on the Internet hardly renders the content of the report 'not reasonably subject to dispute' "].)

4

seat more than 200 people. Those in "yellow" counties were limited to 50 percent capacity. The Blueprint was rescinded by Executive Order N-07-21 in June 2021.

B. *The Litigation*

In April 2021, 640 Tenth, LP, O'Frank, LLC, Fit Athletic Club-San Diego, LLC, and Crossfit East Village Corporation filed a third amended complaint (Complaint) against Gavin Newsom in his capacity as Governor of California and other state officials (collectively, state defendants),[5] as well as the county and Wilma J. Wooten, in her official capacity as Public Health Officer.

Owners sued on behalf of themselves and three classes consisting of: all (1) restaurants and (2) gyms in the County; and (3) California businesses "whose operations or activities are misclassified or other improperly [*sic*] subject to a complete or total shutdown order(s), under the authority of the Blueprint . . . ." (Underscore omitted.)

The Complaint alleges six causes of action:

- Declaratory Judgment—alleging that the state defendants exceeded statutory authority in implementing the Blueprint and associated orders and directives; or alternatively, caused a regulatory taking.

- Injunctive Relief—seeking to restrain defendants from enforcing the Blueprint, Guidance and associated orders.

---

[5]     The Complaint also names "Xavier Becerra, in his official capacity as Attorney General of California" and "Tomas J. Aragon, [in] his official capacity as State Health Officer and Director of the California Department of Public Health."

- Orders Exceed Statutory Authority—alleging the business shut-down orders "are ultra vires and exceed [the Governor's] statutory authority."[6]

- Equal Protection—claiming the Blueprint, orders, and restrictions are based on arbitrary classifications that are not rationally related to promoting public health.

- Inverse Condemnation—alleging the Blueprint and related orders effected a taking of property without compensation.

- Writ of Mandate—claiming the defendants failed to comply with a ministerial duty to comply with the APA.

After conducting a hearing, the superior court sustained demurrers without leave to amend. We independently review the resulting judgment. (*Anselmo v. Grossmont-Cuyamaca Community College District* (2018) 25 Cal.App.5th 948, 951 (*Anselmo*).)[7]

## DISCUSSION

A. *The Governor's Orders and Public Health Directives Issued Under the Emergency Act Are Not Subject to The APA*

    1. *The Emergency Act and The APA*

The Emergency Act empowers the Governor to proclaim a state of emergency when conditions of "extreme peril" caused by, among other things, an "epidemic" are "likely to be beyond the control of the services, personnel,

---

[6]    This cause of action is alleged against only the state defendants.

[7]    A complaint is required to contain a "statement of the facts constituting the cause of action, in ordinary and *concise* language." (Code Civ. Proc., § 425.10, subd. (a)(1), italics added.) Violating this precept, the Complaint begins with a three page "Introduction" resembling closing argument in a jury trial. It appears that attached to the Complaint is a 30-page document entitled "Memorandum of Points and Authorities." We disregard everything in the Complaint other than well-pleaded factual allegations and matters properly subject to judicial notice. (*Anselmo*, *supra*, 25 Cal.App.5th at p. 951.)

equipment, and facilities of any single county, city and county, or city . . . ." (§ 8558, subd. (b).) In those circumstances, the Governor has "complete authority over all agencies of the state government and the right to exercise within the area designated all police power vested in the state . . . to effectuate the purposes of [the Emergency Act]." (§ 8627.) Police power includes "the power to legislate." (*Newsom v. Superior Court* (2021) 63 Cal.App.5th 1099, 1113.) Thus, under the Emergency Act the Governor may "make, amend and rescind orders and regulations" which "shall have the force and effect of law" and take effect immediately. (§ 8567, subd. (a).)

The APA establishes procedures for state agencies to adopt regulations.[8] For instance, an agency must (1) give the public notice of its proposed regulatory action (§ 11346.4); (2) issue a complete text of the proposed regulation with a statement of the reasons for it (§ 11346.2, subds. (a) & (b)); (3) give interested parties an opportunity to comment on the proposed regulation (§ 11346.8); (4) respond in writing to public comments (§ 11346.9, subd. (a)(3)); and (5) forward a file of all materials on which the agency relied to the Office of Administrative Law (§§ 11342.550, 11347.3, subd. (c)), which reviews the regulation for, among other things, consistency with the law, clarity, and necessity (§ 11349.1).

---

[8] "In the APA . . . 'agency' means a state entity exercising delegated authority to adopt regulations." (Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2021) ¶ 22:11 (hereafter California Practice Guide: Administrative Law).) " 'Regulation' means every rule, regulation, order, or standard of general application . . . adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (§ 11342.600.) Owners contend, and defendants do not contest, that in issuing orders under the Emergency Act, the office of the Governor is an "agency" issuing "regulations" within the meaning of the APA. We express no opinion on that issue, which is not before us.

The purposes of the APA process are to provide notice to persons affected by a regulation and give them a voice in its creation. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568.) The procedure also ensures the agency does not adopt rules only it knows about. (*Kings Rehab. Ctr., Inc. v. Premo* (1999) 69 Cal.App.4th 215, 217.) Regulations subject to the APA, but adopted not in compliance with it, are invalid. (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333.)

Determining whether the Governor's exercise of police power under the Emergency Act is subject to APA is first and foremost a matter of statutory interpretation. " 'We start with the statute's words, which are the most reliable indicator of legislative intent.' [Citation.] ' "We interpret relevant terms in light of their ordinary meaning, while also taking account of any related provisions and the overall structure of the statutory scheme to determine what interpretation best advances the Legislature's underlying purpose." ' [Citations.] 'If we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids, including legislative history or purpose to inform our views.' " (*In re A.N.* (2020) 9 Cal.5th 343, 351–352.)

Under section 8571, the Governor's emergency powers include authority to "suspend any regulatory statute . . . where the Governor determines and declares that strict compliance with any statute, order, rule, or regulation would in any way prevent, hinder, or delay the mitigation of the effects of the emergency." In May, after directing the Health Department to establish criteria and procedures for local officials to use in allowing businesses to reopen, Governor Newsom invoked this power to suspend the operation of the APA. Executive Order N-60-20 states in part:

8

"[U]nder the provisions of Government Code section 8571, I find that strict compliance with the Administrative Procedure Act . . . would prevent, hinder or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic."  [¶] . . . [¶]

"Nothing related to the establishment or implementation of . . . criteria or procedures [established by the Public Health Officer], or any other aspect of this Order, shall be subject to the Administrative Procedure Act . . . ."

By its own plain terms, the Governor's authority under section 8571 to suspend "any regulatory statute" includes the APA.  (See *People v. Dunbar* (2012) 209 Cal.App.4th 114, 117 [" '[t]he word "any" means without limit and no matter what kind"].)  Therefore, executive order N-60-20 precludes Owners' claims that the Guidance and Blueprint, issued in July and August respectively, are invalid for lack of APA compliance.

In urging that the APA applies, Owners maintain that Executive Order N-60-20 "never came close to 'suspending' anything" because it "never used the word 'suspend' " and merely deals with matters of " 'internal management.' "

We understand the executive order differently.  Executive Order N-60-20 provides in part:

"IT IS HEREBY ORDERED THAT:  [¶]

"1)  All residents are directed to continue to obey State public health directives as made available [on covid19.ca.gov website] and elsewhere as the State Public Health Officer may provide."

The Governor's order is clearly not about internal management of local government.  Rather, in the face of a deadly pandemic, it directs all California residents to obey then-existing and future COVID-19 Health Department directives.  Executive Order N-60-20 further authorized the

9

Health Department to take *any* additional action deemed necessary to protect public health during the pandemic, stating:

> "The State Public Health Officer may, from time to time and as she deems necessary to respond to the dynamic threat posed by COVID-19, revise the criteria and procedures set forth [here]. ***Nothing related to the establishment or implementation of such criteria or procedures, or any other aspect of this Order, shall be subject to the* [APA].** Nothing in this paragraph . . . shall limit the authority of the State Public Health Officer to take any action she deems necessary to protect public health in the face of the threat posed by COVID-19*,* including (but not limited to) any necessary revision to the four-stage framework previously articulated . . . ." (Italics and boldface added.)

In a related argument, Owners point to certain APA-compliant Cal-OSHA regulations dealing with business operations during the pandemic (Cal. Code Regs., tit. 8, § 3205 (regulation 3205)). They contend that the Governor could not have determined the APA would " 'prevent, hinder, or delay' " Health Department directives when his "public words and actions have shown precisely the opposite." Although Owners do not come right out and say it, we understand their argument to be that because *other agencies* engaged in APA-compliant rulemaking dealing with the pandemic, the Governor's finding in Executive Order N-60-20 that "strict compliance with the [APA] would prevent, hinder or delay" must be untrue.

Putting aside that as a reviewing court we do not make such veracity determinations, the argument fails on its merits too. COVID-19 rulemaking by *other* agencies (e.g., Cal-OSHA) involves different and distinct concerns and contexts. For example, regulation 3205 requires employers to establish a written program for employees to communicate any COVID-19 symptoms "without fear of reprisal." In the Emergency Act, the Legislature gave the

10

Governor broad authority to stem a potentially deadly virus that spreads through close human contact. In that effort, days and even hours count. Promulgating regulations for employees to report COVID-19 symptoms is qualitatively different. That some administrative agencies found APA compliance would not hinder the efficacy of their pandemic related regulations says nothing about whether it was reasonable to conclude that applying the APA to the Governor's emergency orders would have effectively eviscerated them.

In sum, we hold that in May the Governor suspended application of the APA as provided in Executive Order N-60-20. For this reason alone, Owners' claim that the Guidance and/or Blueprint—issued in July and August respectively—are invalid as not being APA-compliant must fail.

The remaining APA issue is whether the stay-at-home directive promulgated in Executive Order N-33-20, which *preceded* Executive Order N-60-20, is APA-exempt for some other reason. As we explain next, it is.

The APA does not apply to a regulation "that embodies the only legally tenable interpretation of a provision of law." (§ 11340.9, subd. (f).) This exception applies " 'where the law "can reasonably be read only one way" [citation], such that the agency's actions in applying the law are . . . patently compelled by . . . the statute's plain language.' " (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 432 (*Missionary Guadalupanas*).) This exception codifies the principle that if certain policies and procedures are " 'essentially[ ] a reiteration of the extensive statutory scheme which the Legislature has established,' " then there is obviously no duty to formally enact regulations to cover such reiterations. (*Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 62.)

11

Applying this rule turns on the question of ambiguity. An agency's interpretation of a statute is subject to the rulemaking procedures of the APA if the interpretation " 'is required to resolve an ambiguity in the law to be enforced.' [Citation.] ' " 'An ambiguity arises when language is reasonably susceptible of more than one application to material facts.' " ' " (*Missionary Guadalupanas*, *supra*, 38 Cal.App.5th at p. 433.) In contrast, "where the language is reasonably susceptible of only one interpretation as applied to the facts, it is ' "the only legally tenable interpretation of a provision of law" ' " and the APA does not apply. (*Id.* at p. 433; § 11340.9, subd. (f).)

For example, in *Missionary Guadalupanas*, the Department of Managed Health Care directed health service plans to cover abortions. This was APA-exempt because it was the only legally tenable interpretation of the governing statute, which required coverage of "basic health care services," which are broadly defined by statute to include physician services, hospital inpatient services, ambulatory care services, preventive health services, and emergency health services. (*Missionary Guadalupanas*, *supra*, 38 Cal.App.5th at pp. 433–434.)

Here, Owners assert that this type of APA exemption does not apply in this case because the Health Department did not establish that its " 'interpretation follows directly and inescapably from the pertinent provisions of law.' " We disagree. The only legally tenable interpretation of section 8567 is that in a duly proclaimed state of emergency, the Governor's orders "take effect immediately." (§ 8567, subd. (b).) There is no ambiguity. The meaning of "immediately" is not reasonably subject to dispute.

Under the APA a 45-day notice and comment period precedes regulatory enactment. (See *State Water Resources Control Bd. v. Office of Admin. Law* (1993) 12 Cal.App.4th 697, 705 (*State Water Resources*) [the 45-

day period "means that a proposed action cannot be conclusively acted upon until at least 45 days have passed from the date of notification"]; § 11346.4, subd. (a).) Obviously, it would be impossible for the Governor's orders under section 8567, subdivision (a) to "take effect immediately" (*id.,* subd. (b)), *and* at the same time be subject to a 45-day waiting period. The Emergency Act can be interpreted only one way. If the orders take effect immediately, then the APA cannot apply.

In urging a different conclusion, Owners cite *State Water Resources, supra,* 12 Cal.App.4th 697. That case explains that "implied exemptions" to the APA are "if recognized at all, disfavored" and unless "expressly exempted, all administrative regulations must comply with the APA." (*State Water Resources*, at p. 704; § 11346.)[9] But as we have already noted, the express exemption in section 11340.9, subdivision (f) applies here. And even if it did not, *State Water Resources* does not support Owners' argument. That court recognized that an APA exemption may also exist in "unusual circumstances." (*State Water Resources, supra*, 12 Cal.App.4th at p. 704.) As an example of this principle, it cites *Alta Bates Hospital v. Lackner* (1981) 118 Cal.App.3d 614 (*Alta Bates*). (*State Water Resources*, at p. 704 & fn. 6.) In *Alta Bates*, the court held that *emergency* regulations reducing Medi-Cal reimbursement were not subject to the APA because the delay attendant to complying with the APA would completely undermine the regulation's ability to stem the emergency. Summarizing this APA exemption, a treatise explains, "A statute that provides for a 'complete, rational and integrated' set of rulemaking requirements that are *inconsistent* with the APA should be

---

9    Section 11346 subdivision (a) provides in part: "This chapter shall not be superseded or modified by any subsequent legislation except to the extent that the legislation shall do so expressly."

13

construed to supersede the APA rulemaking provisions." (Cal. Practice Guide: Administrative Law, *supra,* at ¶ 26:15.)

In claiming that the APA emergency rulemaking provisions apply under the Emergency Act, Owners also rely on *Wisconsin Legislature v. Palm* (Wis. 2020) 942 N.W.2d 900, which "invalidated indoor dining restrictions for their failure to comply with the provisions of Wisconsin's rulemaking statute." But even a cursory reading of that case shows why it is completely inapt here. In the first page of its opinion, the Wisconsin Supreme Court noted that the case involved "the assertion of power by one unelected official" and was "*not* about Governor Tony Evers' Emergency Order or the powers of the Governor." (*Wisconsin Legislature v. Palm*, at p. 905.)

Owners' reliance on a later Wisconsin case, *Tavern League of Wisconsin v. Palm* (2021) 957 N.W.2d 261 (*Tavern League*), suffers the same problem. It too did not involve a governor's COVID-19 orders promulgated under emergency legislation. (*Id.* at p. 271 (conc. opn. of Hagedorn, J.) [noting that the case arose because the Wisconsin health services official "issued another order doing exactly what this court said she may not do [in *Wisconsin Legislature v. Palm*]"].)

Perhaps Owners' best argument on this issue is that the APA itself contains provisions for an agency to use in adopting emergency regulations and, therefore, implicit in the Emergency Act is that the Governor must follow them. But we draw a different conclusion. An " '[e]mergency' " for purposes of expedited APA rulemaking is "a situation that calls for immediate action to avoid *serious harm* to the public peace, health, safety, or general welfare." (§ 11342.545, italics added.) To qualify, the agency must prepare a "written statement" containing "a description of the specific facts demonstrating the existence of an emergency and the need for immediate

14

action, and demonstrating by substantial evidence, the need for the proposed regulation to effectuate the statute being implemented, interpreted, or made specific and to address only the demonstrated emergency." (§ 11346.1, subd. (b)(2).) The agency must "also identify each technical, theoretical, and empirical study, report or similar document" upon which it relies. (*Ibid.*) Any interested person may challenge an emergency regulation on the ground that the facts recited do not constitute an emergency. (§ 11350, subd. (a).) Interested persons have five calendar days to submit comments "unless the emergency situation clearly poses such an immediate serious harm that delaying action to allow public comment would be inconsistent with the public interest." (§ 11349.6, subd. (b).) An emergency regulation may not remain in effect for more than 180 days unless the agency has complied with otherwise applicable APA procedures before or during the 180 days. (§ 11346.1, subd. (e).)

In contrast, the Governor's Emergency Act power to issue orders having the force of immediately effective law is triggered only by a " '[s]tate of war emergency,' " or a " '[s]tate of emergency.' " (§§ 8558, subds. (a) & (b), 8567, subd. (b).) Pertinent here, a " 'state of emergency' " means "the duly proclaimed existence of conditions of *disaster or extreme peril* to the safety of persons and property . . . which, *by reason of their magnitude*, are or are likely to be beyond the control of" local government entities. (§ 8558, subd. (b), italics added.) The Governor is empowered to declare a state of emergency when he finds these circumstances exist and he is requested to do so by local government or he finds that local authority is "inadequate to cope with the emergency." (§ 8625.)

Unlike emergency rulemaking under the APA, the Emergency Act does not require the Governor to support his proclamation with "substantial

15

evidence," a list of studies or reports, or even a description of facts demonstrating the existence of the emergency.  Instead, "[i]ssuance of the proclamation implies the Governor has made the [requisite] finding." (*California Correctional Peace Officers Assn. v. Schwarzenegger* (2008) 163 Cal.App.4th 802, 820.)  "[I]t is sufficient if the proclamation sets forth circumstances that support the implied finding."  (*Ibid.*)

Owners' argument is that because a streamlined procedure for emergency APA regulations exist, the Governor was obliged to follow them when issuing orders under the Emergency Act.  But a Band-Aid will not work when a tourniquet is required, nor will procedures designed to ameliorate "serious harm" (§ 11342.545) do in the face of a "disaster or extreme peril" (§ 8558, subd. (b)) such as the COVID-19 pandemic.  The Legislature understood this distinction and provided separate statutory schemes for two qualitatively different types of emergency.  In the face of an extreme peril to public health, the Legislature has provided that the Governor is not required to comply with any APA rulemaking procedures, ordinary or emergency.

Our holding that the Governor's law-making power under the Emergency Act is not subject to the APA is also supported by considering the broader statutory context.  (See *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385 ["critical to an understanding of [the statute] is its statutory context"].)  The Emergency Act not only deals with a present state of emergency, but also contemplates that the Governor will prepare "orders and regulations needed to carry out" its provisions "in advance of a . . . state of emergency."  (§ 8567, subd. (c).)  By statute, such advance orders "shall be exempt" from the APA.[10]

---

10    Owners contend that advance orders must be "filed pursuant to the APA."  But section 8567, subdivision (d) actually provides that the orders

16

To accept Owners' argument would mean that orders issued *during* a state of emergency—when time is of the essence—are subject to the APA, but any issued *before,* in contemplation of some possible future state of emergency, are not.  We cannot conceive of any plausible reason for such a construction, and Owners offer none.  Rather, the only reasonable conclusion is that in enacting section 8567 subdivision (d), it went without saying that the Governor's orders issued *during* a state of emergency would not be subject to the APA.

Accordingly, the superior court correctly sustained the demurrers to the first (declaratory judgment), third (acts in excess of Governor's authority), and sixth (writ of mandate) causes of action because an essential element of each is that defendants failed to comply with the APA.

B.  *The Complaint Fails To Allege Facts Constituting a Taking*

The takings clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides:  "[N]or shall private property be taken for public use, without just compensation."  (U.S. Const., 5th Amend.)[11]  A physical taking occurs where the government physically intrudes upon a plaintiff's property or allows others to do so.  (*Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 427 and fn. 5 (*Loretto*).)  Owners have not alleged a physical taking.[12]

---

"shall be filed" not pursuant to the APA, but rather "in the office of the Secretary of State and with the county clerk of each county."

[11]    Whether the activity of doing business, or the activity of making a profit is a property interest under the Fifth Amendment is an issue that has not been raised in this case and, therefore, one on which we offer no opinion.

[12]    The Complaint alleges that restrictions on business operations "has caused both a regulatory *and physical taking . . . .*"  (Italics added.)  However, "physical taking" is a legal conclusion and, as such, is disregarded on a

17

Regulatory takings are distinct.  There are two types of regulatory action that amount to a categorical taking.  The first is where government requires an owner to suffer a permanent physical invasion of the property, however minor.  (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 538 (*Lingle*).)  Second, "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of [the] property" are a taking.  (*Ibid.*)  Owners do not allege either type of categorical regulatory taking.  (See *Friends of DeVito v. Wolf* (2020) 227 A.3d 872, 896 ["the public health rationale for imposing the restrictions . . . to suppress the spread of the virus throughout the [state] is a stop-gap measure and, by definition, temporary"].)

"A regulation, however, may effect a taking though, as is true here, it does not involve a physical invasion and leaves the property owner some economically beneficial use of his property."  (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 774, italics omitted.)  In these cases, "if regulation goes too far it will be recognized as a taking."  (*Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, 415.)  Given the wide variety of ways in which government regulations can affect property interests, the Supreme Court has eschewed any " 'set formula' for determining" how far is too far.  (*Penn Cent. Transp. Co. v. New York City* (1978) 438 U.S. 104, 124 (*Penn Central*).)  Rather, determining whether a partial regulatory taking has occurred "require[s] an 'ad hoc' factual inquiry" considering what have become known as *Penn Central* factors:  (1) the economic impact of the regulation; (2) its interference with reasonable investment-backed

---

demurrer.  (See *Arizona v. California* (1931) 283 U.S. 423, 462, fn. 14 [allegation that the Secretary of the Interior had "seized and had taken possession" disregarded as a "conclusion of law"].)  The Complaint does not allege *facts* constituting a physical taking.

expectations; and (3) the character of the government action.[13] (*Horne v. Dep't of Agric.* (2015) 576 U.S. 351, 360.) These are the "principal guidelines for resolving regulatory takings claims." (*Lingle, supra,* 544 U.S. at p. 539.)

Owners have not alleged a legally sufficient regulatory taking claim. Their attempt to do so is met first with a virtual torrent of California federal district court decisions rejecting similar challenges to Governor Newsom's emergency COVID-19 orders. (*Abshire v. Newsom* (E.D.Cal. Aug. 5, 2021, No. 2:21-cv-00198-JAM-KJN) 2021 U.S.Dist. Lexis 147223, *20–*24 [restaurants and lodgings]; *Mission Fitness Ctr., LLC v. Newsom* (C.D.Cal. May 10, 2021, No. 2:02-CV-09824-CAS-KSx) 2021 U.S.Dist. Lexis 89055, *22–*26 [fitness center]; *Metroflex Oceanside LLC v. Newsom* (S.D.Cal. 2021) 532 F.Supp.3d 976, 982; *Excel Fitness Fair Oaks, LLC v. Newsom* (E.D.Cal. Mar. 2, 2021, No. 2:20-cv-02153-JAM-CKD) 2021 U.S. Dist. Lexis 39061, *14–*16 [fitness center]; *Culinary Studios, Inc. v. Newsom* (E.D.Cal 2021) 517 F.Supp.3d 1042, 1063–1065; *Pcg-Sp Venture I LLC v. Newsom* (C.D.Cal. June 23, 2020, No. EDCV 20-1138 JGB (KKx)) 2020 U.S.Dist. Lexis 137155, *28–*30.)[14]

---

13    The "individualized scrutiny" required of a regulatory takings claim "does not foreclose resolution on a motion to dismiss . . . ." (*Hotel & Motel Ass'n of Oakland v. City of Oakland* (9th Cir. 2003) 344 F.3d 959, 966.)

14    District courts outside the Ninth Circuit have reached similar conclusions involving their particular state's COVID-19 business restrictions. (See, e.g., *Skatemore, Inc. v. Whitmer* (W.D.Mich. Sept. 2, 2021, No. 1:21-cv-66) 2021 U.S.Dist. Lexis 166744, *15 [bowling alley]; *Case v. Ivey* (M.D.Ala. June 1, 2021, No. 2:20-CV-777-WKW) 2021 U.S.Dist. Lexis 102520, *66–*69 [barber shops]; *Underwood v. City of Starkville* (N.D.Miss. May 11, 2021, No. 1:20-CV-00085-GHD-DAS) 2021 U.S.Dist. Lexis 90739, *22–*28 [fitness center]; *Daugherty Speedway v. Freeland* (N.D.Ind. 2021) 520 F.Supp.3d 1070, 1078 (*Daugherty Speedway*) [racetrack]; *Auracle Homes, LLC v. Lamont* (D.Conn. 2020) 478 F.Supp.3d 199, 220–223; *TJM 64, Inc. v. Harris*

We independently reach the same conclusion applying the *Penn Central* factors.

### 1.     *Economic Impact*

The goal of regulatory takings analysis is to identify actions that are "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." (*Lingle, supra,* 544 U.S. at p. 539.)  Thus, recovery is limited to "extreme circumstances." (*United States v. Riverside Bayview Homes* (1985) 474 U.S. 121, 126.)  Applying this overview to the economic impact factor, typically the harm is measured by the difference between the fair market value of the property as subject to the regulatory restraint, and its value without it.  In summarizing the regulatory takings case law, the Court of Claims—the specialized federal court with subject matter jurisdiction over most takings claims against the federal government—states that a diminution in value "well in excess of 85 percent" is generally necessary before a court will find a regulatory taking. (*Walcek v. U.S.* (2001) 49 Fed.Cl. 248, 271.)  The Ninth Circuit has suggested an even higher threshold. (*Colony Cove Properties, LLC v. City of Carson* (9th Cir. 2018) 888 F.3d 445, 451 [75 percent to 92.5 percent diminution in value does not constitute a taking].)

Here, Owners allege that the Governor's executive orders and related Health Department regulations "have significantly reduced plaintiffs' revenues, profits and income, resulting in significant uncompensated harm." On demurrer, we accept all that as true.  But a "significant" diminution in

---

(W.D.Tenn. 2020) 475 F.Supp.3d 828, 837–840 (*TJM 64*) [restaurants]; *Elmsford Apt. Assocs., LLC v. Cuomo* (S.D.N.Y. 2020) 469 F.Supp.3d 148, 162–168 [landlords]; *Bimber's Delwood, Inc. v. James* (W.D.N.Y. 2020) 496 F.Supp.3d 760, 782–785 (*Bimber's Delwood*) [bars and pool halls]; *Baptiste v. Kennealy* (D.Mass. 2020) 490 F.Supp.3d 353, 387–390 [landlords].)

value is not enough to constitute a regulatory taking. The question is whether the challenged orders were the functional equivalent of government appropriating the property. Although no litmus test determines whether a taking occurred, even a "significant" economic loss is not enough.

Owners further allege that if the emergency orders and restrictions are not enjoined, "plaintiffs are threatened with the imminent total loss of their property interests." This too is insufficient. A regulatory taking requires actual severe economic loss, not merely threatened harm. In sum, this factor weighs against Owners' claim.

2. *Investment-Backed Expectations*

The second *Penn Central* factor considers the regulation's interference with the property owner's investment-backed expectations. This factor serves to limit recovery to owners who bought their property in reliance on a state of affairs that did not include the challenged regulation(s). (*Allen v. Cuomo* (2d Cir. 1996) 100 F.3d 253, 262.) In evaluating this factor, courts consider whether the claimant (1) operated in a highly regulated industry; (2) knew or should have known of the problem that spawned the regulation when purchasing the property; and (3) could reasonably have anticipated the possibility of such regulation in light of the regulatory environment at the time of purchase. (*Appolo Fuels, Inc. v. U.S.* (Fed.Cir. 2004) 381 F.3d 1338, 1349.)

The Complaint alleges that the emergency orders harmed their "distinct, investment-backed expectations in their businesses." Although this is more a legal conclusion than factual allegation, obviously gyms and restaurants derive their profits from in-person patronage, and there are precious few customers to generate sales when the doors are ordered shut.

21

Accordingly, this factor favors Owners to some extent. Of course, the food service industry is highly regulated, and we can reasonably assume fitness centers are too. Both types of businesses have to be sensitive to sanitation issues as a public health concern. Still, it is fair to say that almost everyone was expecting to conduct business as usual when 2019 transitioned to 2020. Moreover, the public health orders at issue here are different from the type of health restrictions typically imposed on restaurants. (See *TJM 64, Inc., supra,* 475 F.Supp.3d at p. 338 [finding that restaurant owners' reasonable investment-backed expectations supported a finding of regulatory taking].)

3.  *The Character of the Governmental Action*

In *Penn Central*, the Supreme Court explained that regulations adjusting "the benefits and burdens of economic life to promote the common good" rather than causing a "physical invasion" of property rarely constitute a taking. (*Penn Central, supra*, 438 U.S. at 124). Accordingly, the "character of the government action" factor focuses on whether the government action involves a temporary physical occupation.[15] (See Echeverria, *Making Sense of Penn Central* (2005) 23 UCLA J. Envtl. L. & Pol'y 171, 202.) As applied here, this factor undercuts Owner's claim because they do not and cannot allege even a temporary physical intrusion.

There are, however, other ways courts have approached the " 'character' " issue. In some regulatory takings cases, the " 'character' " factor considers whether the regulation creates a " 'reciprocity of advantage.' " (See *Keystone Bituminous Coal Ass'n v. DeBenedictis* (1987) 480

---

15    Permanent physical occupations are categorical takings. (*Loretto, supra*, 458 U.S. at pp. 435–440 [law requiring landlord to allow cable television equipment in their apartment buildings constituted a taking, even though the facilities occupied at most only 1.5 cubic feet of property].)

U.S. 470, 488 (*Keystone*).)  The concept is that the burden imposed on any one person by a regulation may be ameliorated by corresponding benefits arising because others are similarly restricted.  For example, if fewer people become seriously ill or die from COVID-19 because indoor operations at restaurants and gyms are prohibited, then the regulated businesses will enjoy long-term benefits (i.e., more customers).

A third approach to "character" is to focus on whether a regulation is designed to prevent serious public harm.  This stems from long-standing Supreme Court authority interpreting the takings clause to permit even the destruction of property so long as the government is acting to abate an imminent threat to the public welfare.  In *Mugler v. Kansas* (1887) 123 U.S. 623 for example, a distiller who had built a brewery while it was legal to do so challenged a Kansas constitutional amendment prohibiting the manufacture and sale of liquor.  Recognizing that as a result the property had little value, the Court explained that a "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property." (*Id.* at pp. 668–669.)  The principle behind this rule is that " 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.' " (*Keystone*, *supra*, 480 U.S. at pp. 491–492.)  Similarly, in *Miller v. Schoene* (1928) 276 U.S. 272, the Court held that the takings clause did not require Virginia to compensate owners of cedar trees that the state had ordered destroyed to prevent a disease from spreading to nearby apple orchards, which were far more valuable.  (*Id.* at p. 280).

In this line of cases, particularly relevant here are two involving government orders temporarily shutting down businesses.  *United States v.*

*Central Eureka Mining Co.* (1958) 357 U.S. 155 involved an order shutting down a gold mine deemed nonessential during wartime. The Court stated, "the mere fact that the regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation." (*Id*. at p. 168.) In light of the "temporary restriction[ ]," wartime demands on resources, and that the shutdown was "essential to the war effort," the Court found no regulatory taking. (*Id.* at pp. 168–169.)

A similar result occurred in *Nat'l Amusements, Inc. v. Borough of Palmyra* (3d Cir. 2013) 716 F.3d 57. In that case the government closed an open-air flea market for five months because live munitions left behind when the site had been used as an army weapons-testing facility threatened public safety. Rejecting the owner's regulatory taking claim, the Court of Appeals held that the "emergency action to temporarily close" the market constituted an exercise of the state's "police power that did not require just compensation." (*Id*. at p. 63.)

Applying the *Penn Central* analysis, we conclude that the Complaint fails to allege an actionable regulatory taking. It does not allege the requisite high degree of economic harm. And although the business restrictions adversely affected Owners' reasonable investment-backed expectations, the Governor's emergency orders "are quintessential examples of regulations that 'adjust[ ] the benefits and burdens of economic life to promote the common good.' " (*Penn Central*, *supra*, 438 U.S. at p. 124.) The character of these actions is akin to that of other historical examples of governmental actions undertaken to counter serious threats to the public that were subsequently found not to be takings.

24

We thus join a large number of other courts that have reached similar conclusions applying the *Penn Central* factors to COVID-19 business restrictions. (See, e.g., *Daugherty Speedway, supra,* 520 F.Supp.3d at p. 1078 [noting that " 'courts across the country agree that the . . . character of the disputed government action during the COVID-19 pandemic, weighs heavily in Defendants' favor," and dismissing claim that an order closing a racetrack was a taking]; *TJM 64, supra,* 526 F.Supp.3d at p. 338 [dismissing restaurants' claim that closure order due to COVID-19 was a regulatory taking, reasoning "it is undeniable that th[e] exercise of police powers was intended to promote the common good in response to a global pandemic that impacted public safety and the economy across the country[,] [and] the Closure Order was an effort to 'adjust[ ] the benefits and burdens of economic life to promote the common good' "]; *Bimber's Delwood, supra,* 496 F.Supp.3d at p. 784 ["the character of the government action here is a temporary exercise of the police power to protect the health and safety of the community, which weighs against a taking"]; *Leb. Valley Auto Racing Corp. v. Cuomo* (N.D.N.Y. 2020) 478 F.Supp.3d 389, 402 [racetrack owner's challenge to order prohibiting spectators or fans failed to state takings claim where the government "shifted the 'benefits and burdens of economic life' in an effort to keep its citizens safe during a deadly pandemic"].) The superior court correctly sustained the demurrers to the fifth cause of action.

## C. *Owners Have Forfeited Their Equal Protection Claim By Not Raising It in the Opening Brief*

Owners' fourth cause of action alleges that the Blueprint, orders, and restrictions "are based on arbitrary classifications and criteria that are not rationally related to promoting public health" and, therefore, violate their right to equal protection under the Fourteenth Amendment. Applying rational-basis review, the superior court sustained demurrers to this cause of

25

action without leave to amend, noting that " 'every court considering equal protection challenges brought by business owners to COVID-related restrictions has upheld [them].' "

Owners' 76-page opening brief does not challenge this ruling. The term "equal protection" does not appear a single time in the brief. Even after the state and county defendants called this omission to our attention in the respondents' brief, Owners also failed to even belatedly mention equal protection in their reply. Accordingly, the issue is forfeited. (*Vines v. O'Reilly Auto Enterprises, LLC* (2022) 74 Cal.App.5th 174, 190.)

D.   *Owners Did Not Plead Any Due Process Claim*

In various places, Owners' opening brief asserts the Governor's emergency orders and related Health Department directives denied them due process. Perhaps its clearest expression is near the end, where Owners assert that "fundamental principles of due process come into play" where the challenged orders are made "without notice or hearing." They further claim the "urgent risk to their businesses" presents "serious due process violations."

However, as the state defendants point out, the Complaint does not contain any cause of action alleging due process violation(s).[16] And although the three-page "Introduction" to the Complaint asserts the state defendants committed "due process violations," that is a legal conclusion and not contained in the actual charging allegations. On our own, we have scoured the Complaint to see if it alleges a cognizable due process claim. The first cause of action for "Declaratory Judgment" includes in various places

---

[16]   The state defendants represent that Owners' second amended complaint contained a cause of action for due process violations, but that was abandoned in the operative Complaint. However, the citation provided to support that assertion  is to the third amended complaint, not the second, which does not appear to be part of the record on appeal.

26

allegations of due process violations. But declaratory relief is an equitable remedy, not a cause of action (*Faunce v. Cate* (2013) 222 Cal.App.4th 166, 173), and in any event Owners do not seek a declaration that defendants violated their due process rights. In sum, we agree with the state defendants; the Complaint does not contain a cause of action for alleged due process violations.

E.    *Owners " 'Commandeering' " Claim Fails*

The Emergency Act empowers the Governor to "commandeer or utilize" private property "deemed by him necessary . . . [and] the state shall pay the reasonable value thereof." (§ 8572.) In a one-sentence argument embedded in a paragraph discussing the Fifth Amendment claim, Owners' opening brief cited section 8572. The issue comes up again in a very cursory manner in the reply brief, where they claim, "What constitutes 'commandeering' is a factual question for the [t]rial [c]ourt . . . ."

Setting aside that this argument is forfeited because it is not presented in a separate heading, nor developed with reasoned argument and citation to authority[17]—it also fails on the merits. Like California, Minnesota law empowers the governor of that state to declare an emergency and make "orders" to carry out the provisions of the statute. (See *Buzzell v. Walz*

---

[17]    The Courts of Appeal have repeatedly warned that "[w]hen a potential issue or argument is not presented to an appellate court in a separate heading or subheading, that issue or argument is deemed forfeited." (*Phillips v. Honeywell Internat. Inc.* (2017) 9 Cal.App.5th 1061, 1077.) This is true even where the issue may have been referenced, discussed or otherwise alluded to in other portions of the brief. (*Cox v. Griffin* (2019) 34 Cal.App.5th 440, 453–454 [contention of error raised in " 'introduction' " but not discussed under a separate heading or subheading forfeited].) Additionally, arguments made without reasoned argument and citations to authority may be treated as forfeited. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

(Minn.Ct.App. 2021) 962 N.W.2d 894, 897–898 (*Buzzell*).) In March 2020—the same month that Governor Newsom issued the shut-down order—the governor of Minnesota declared an emergency due to COVID-19 and issued an executive order closing restaurants and other places offering on-premises consumption of food. (*Buzzell*, at p. 896.) Like California's Emergency Act, Minnesota's emergency services law empowers its governor to " 'commandeer' " property for emergency purposes, but requires the owner be paid "just compensation for its use." (*Id.* at p. 898, citing Minn. Stat. Ann. § 12.34.) Rejecting essentially the same argument that Owners make here, in *Buzzell* the Minnesota appellate court held "the only reasonable interpretation of the term 'commandeer' . . . requires direct, active use of private property by the government for emergency management purposes. The term does not apply in situations in which the governor has placed a restriction on a private party's own ability to use his or her property." (*Buzzell*, at pp. 901–902.)

A New Jersey appellate court considered the same issue under its emergency services legislation. In *JWC Fitness, LLC v. Murphy* (N.J. App.Div. 2021) 265 A.3d 164, the court held that executive orders temporarily closing fitness centers "did not have the effect of commandeering and utilizing plaintiff's property." (*Id.* at p. 431.) Looking to the ordinary definitions of "commandeer" and "utilize," the New Jersey court held that "in the context in which the words are used, the most reasonable understanding of the statute is that it authorizes the government to seize private property or take possession of it akin to a physical taking under the constitution, i.e., to 'commandeer' the property, and thereafter 'utilize' the property for the governmental purpose of avoiding or protecting against an emergency." (*Id.* at p. 427.)

We find this analysis persuasive. To the extent the Complaint purports to allege a compensable " 'commandeering' " under the Emergency Services Act, it fails to state facts constituting a cause of action.

## F. *No Leave to Amend*

Finally, Owners ask for leave to amend the Complaint. However, although they may seek leave to amend even for the first time on appeal (Code Civ. Proc., § 472c, subd. (a)), it is their burden to "show in what manner [they] can amend [their] complaint and how that amendment will change the legal effect of [their] pleading." (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) In asking that we grant leave to amend, Owners simply state that "common sense, due process and fair play unanimously require an opportunity for amendment on remand." This is insufficient.[18]

---

[18] In addition to joining in the state defendants' brief, in a separate brief the county defendants contend they are immune from suit under the Eleventh Amendment, and in any event, the Complaint fails to allege facts showing they proximately caused any harm. Our disposition makes it unnecessary to consider these contentions.

DISPOSITION

The judgment is affirmed.  Respondents are entitled to costs on appeal.


DATO, J.


WE CONCUR:


McCONNELL, P. J.


AARON, J.

30